IN RE: COMSHARE, INCORPORATED SECURITIES LITIGATION.

**Harry M. Hoffman, et al.,
Plaintiffs–Appellants,**

v.

**Comshare, Inc., et al., Defendants–
Appellees.**

**No. 97–2098.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 28, 1999.

Decided July 8, 1999.

Rehearing and Suggestion for Rehearing
En Banc Denied Aug. 23, 1999.

Alan R. Miller, George LaPlata, Birmingham, MI, Sherrie R. Savett (argued and briefed), Arthur Stock, Berger & Montague, Philadelphia, PA, Stuart H. Savett, Savett, Frutkin, Podell & Ryan, Philadelphia, PA, Patrick E. Cafferty, Miller, Faucher, Chertow, Cafferty & Wexler, Ann Arbor, MI, for Plaintiffs–Appellants.

Kathleen McCree Lewis (briefed), Donald S. Young (argued and briefed), Dykema Gossett, Detroit, MI, Daniel J. Stephenson (briefed), Andrew J. McGuinness (briefed), Dykema Gossett, Ann Arbor, MI, for Defendants–Appellees.

Jacob H. Stillman (briefed), Luis DeLaTorre, U.S. Securities and Exchange Commission, Washington, DC, Mark R. Pennington, Adam C. Pritchard (briefed), Securities and Exchange Commission, Washington, DC, Harvey J. Goldschmid (argued), Securities and Exchange Commission, Office of General Counsel, Washington, DC, Jonathan C. Dickey (briefed), Gibson, Dunn & Crutcher, Palo Alto, CA, Louis A. Craco (briefed), Willkie, Farr & Gallagher, New York, NY, for Amici Curiae.

Before: KENNEDY, DAUGHTREY, and CLAY, Circuit Judges.

## OPINION

CLAY, Circuit Judge.

Plaintiffs, shareholders of Comshare, Inc. ("Comshare"), appeal an order entered by the district court dismissing pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure their class action complaint against Comshare and several of its officers and directors alleging securities fraud in violation of the Securities and

Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78t(a) (1998). Specifically, the parties ask us to decide an issue of first impression for this Court—whether, under the heightened pleading standards set forth in the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4(b)(2) (1998), a plaintiff alleging securities fraud in violation of the Securities and Exchange Act may survive a motion to dismiss by alleging facts giving rise to a strong inference of recklessness or of motive and opportunity. For the reasons set forth below, we AFFIRM, on different grounds, the judgment of the district court.

## I.

Defendants include Comshare, a Michigan corporation headquartered in Ann Arbor, Michigan that develops, licenses, and services computer software to enable business professionals to use data in decision-making. Comshare's fiscal year ends on June 30 of each calendar year. Comshare stock is publicly traded on the NASDAQ. On June 30, 1996, Comshare had approximately 9.7 million shares outstanding. The majority of Comshare's revenues derive from sales outside of the United States, and revenue from the software licensing has comprised approximately 50% of Comshare's reported revenues. Various subsidiaries conduct Comshare's foreign operations.[1] Defendants also include the following officers and directors of Coms-

hare: (1) T. Wallace Wrathall, President and Chief Executive Officer ("CEO"); (2) Kathryn A. Jehle, Chief Financial Officer ("CFO"); (3) Richard L. Crandall, Chairman of the Board of Directors; (4) Stephen R. Fluin, Vice President for European Operations; (5) Dion T. O'Leary, Vice President for Agents and Distributors; and (6) Donald J. Walker, Senior Vice President. Walker left Comshare in May 1996, and Fluin left Comshare in October 1996.

Since the district court stayed class certification pending its resolution of Defendants' motion to dismiss, the case presently before this Court is not a class action but is instead a consolidation of several cases that the district court designated as In re Comshare Incorporated Securities Litigation. The nine Plaintiffs in this action include Harry and Deborah Hoffman, Donald Knuth, Nancy Totten, Mark Cook, Oleg Kohkhlov, Paul Knapp, Christopher Yost, and Gabriel Briceno. All but two of the Plaintiffs first bought shares of Comshare common stock on or after July 30, 1996.[2] The remaining two, Totten and Kohkhlov, purchased their shares of Comshare common stock both before and after July 30, 1996.[3] According to Comshare, Plaintiffs collectively own 17,621 shares, or 0.18%, of Comshare's stock.

### A.

Comshare's revenue generally consists of software license fees, software mainte-

1. Plaintiffs claim that Comshare presented itself "as a single entity, publishing only consolidated financial statements" and treated "revenue from subsidiaries as revenue from Comshare's own operations." (Appellant's Br. at 5.) Yet, as a Reuters business report cited by Plaintiffs demonstrates, the public knew that Comshare's British operations were conducted through "its United Kingdom subsidiary." (J.A. at 170.) Plaintiffs do not contest that in fact Comshare published consolidated financial statements because only Comshare, Inc. is publicly owned, and that the financial statements themselves refer to the subsidiaries. Defendants further point out that Comshare's public filings repeatedly disclosed the names and locations of Comshare's subsidiaries, and that Comshare's 1995

Report identified its United Kingdom offices under the heading "Comshare Ltd." (Appellee's Br. at 7; J.A. at 339.)

2. Cook purchased 5,000 shares on July 30, 1996. Knuth purchased 2,000 shares on July 31, 1996. Briceno purchased 400 shares on August 1. The Hoffmans purchased a total of 1,000 shares on August 1 and August 2, 1996. Knapp purchased 400 shares on August 6.

3. Totten purchased 200 shares on April 22, 1996, and purchased 150 more on July 31, 1996. Kohkhlov purchased 3,000 shares from May 14–24, 1996, purchased 2,600 shares from July 9–24, 1996, and purchased 1,500 shares on July 30, 1996.

nance service fees, and other consulting and service fees. With regard to license fees in particular, Comshare's policy is that it will not recognize revenue in such business until a customer contract is fully executed and the software has been shipped—in other words, the sale must be final before Comshare will recognize its revenue from the transaction. According to Plaintiffs, recognition of the revenue from sales before payment of the purchase prices is reasonably assured violates not only Comshare's own revenue recognition policy, but also violates Generally Accepted Accounting Principles ("GAAP").[4]

On July 30, 1996, the news service Reuters reported that Comshare had delayed publication of its quarterly report for the quarter ended June 30, 1996 because Comshare had not yet completed its audit of its United Kingdom ("UK") subsidiary. On August 6, 1996, after the market closed, Comshare issued a press release stating it was delaying release of the results for the fourth quarter and year ending June 30, 1996 pending completion of its year-end audit, which Comshare had expanded to include a detailed review of orders in the UK and other foreign countries. Specifically, Comshare disclosed that it initiated a detailed review "after discovery of letters setting forth conditions to certain orders in the United Kingdom, which the Company had not been made aware of at the time the revenue was recognized," and disclosed that Comshare was aware of approximately $4 million in such orders. (J.A. at 172.) After this announcement, the price of Comshare stock fell from 18 ½ on August 6, 1996 to a trading low of 10 ¾ on August 7, 1996, and eventually closed at 11 7/8.

On September 5, 1996, after completing its year-end audit, Comshare announced its results for fiscal year 1996. Comshare reported $26.6 million in revenues for the quarter, down from $28.8 million in the fourth quarter of 1995. Comshare also announced that its total revenue had increased 9.8% in fiscal year 1996 as compared with fiscal year 1995, even after accounting for the revenue recognition problem. In its Form 10–K for 1996, Comshare stated:

> In connection with the Company's fiscal 1996 year end audit, the Company discovered side letters setting forth conditions to certain foreign orders in violation of the Company's revenue recognition policies. No violations were found in U.S. orders. The growth in software license revenue in fiscal 1996 for all the Company's products was negatively impacted by these violations, although it is difficult to estimate what license growth would have been in fiscal 1996 without the violation of Company policies.... Corrective actions have been taken, including management changes, personnel terminations and other disciplinary actions and the establishment of new orders procedures.

(J.A. at 264.) Comshare further stated that "[s]everal of the contracts that were not recognized in the fourth quarter are already revenue in the first quarter of FY 1997." (J.A. at 177.)

**B.**

The Hoffmans filed the first complaint in this case on August 9, 1996. Yost filed a second complaint on August 14, 1996. Totten filed a third complaint on August 21, 1996. Knapp and Knuth filed a fourth complaint on September 5, 1996. Each of these complaints alleged a "class period" of April 17, 1996 through August 6, 1996. On October 16, 1996, the parties filed a Joint Motion to Consolidate Actions. The district court consolidated all pending cases before the Honorable Lawrence P. Zatkoff, and permitted Plaintiffs to file a Consolidated Amended Complaint ("Complaint").

---

4. Generally Accepted Accounting Principles "are the conventions, rules and procedures that constitute the professional standards of the accounting profession." *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F.Supp. 1297, 1304 (C.D.Cal.1996).

Plaintiffs filed their Complaint on December 13, 1996. In the Complaint, Plaintiffs extended the class period to August 2, 1995 through August 21, 1996, and added Defendant Walker, who was not named in the original complaints.

The Complaint charges that all Defendants engaged in a scheme to defraud Plaintiffs by knowingly or recklessly disregarding the acknowledged errors in revenue recognition, and that, through its public misrepresentations about its revenue, Defendants fraudulently induced Plaintiffs to purchase Comshare stock at artificially inflated prices in violation of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (1998), and Rule 10b–5, promulgated thereunder by the SEC, 17 C.F.R. § 240.10b–5 (1998). The Complaint further alleges that the individual Defendants are liable as "controlling persons" of Comshare, under Section 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78t(a) (1998). Finally, the Complaint alleges that Defendants Wrathall, Crandall and Jehle made negligent misrepresentations regarding Comshare's financial situation. Generally, Plaintiffs claim that Defendants' actions in improperly recognizing revenue for conditional sales and in thereby misstating its revenue amount to securities fraud. Plaintiffs contend that the side letter agreements and the premature revenue recognition were more than mere negligence, and were instead part of a scheme to defraud the public and to inflate stock prices so that individual Defendants could sell their own shares at high prices. Plaintiffs also claim that individual Defendants profited from this scheme because their compensation plans were tied to the price of Comshare's stock.

On January 31, 1997, Defendants filed, in lieu of an answer, a Motion to Dismiss pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and thereby stayed all discovery pursuant to 15 U.S.C. § 78u–4(b)(3)(B) (1998). Defendants deny the existence of a scheme to defraud. They claim that they first discovered the errors in revenue recognition in 1996 when the year-end, independent audit of Comshare conducted by Arthur Andersen, LLP revealed the existence of "side letters" that certain employees at Comshare's UK subsidiary had given to Comshare customers. (Appellee's Br. at 5.) Defendants claim they then recognized that these side letters made certain sales conditional by giving customers the right to return products under specific circumstances, and that because these sales were not final, Comshare should not have recognized their revenue. (Appellee's Br. at 5.) Defendants maintain that they took corrective measures after discovering the side letter agreements during the 1996 audit.

On the briefs of the parties and without holding a hearing, the district court granted Defendants' motion to dismiss pursuant to Rule 12(b)(6) in a Memorandum Opinion and Order, and entered a Judgment dismissing all claims with prejudice on September 18, 1997. Plaintiffs filed a timely notice of appeal to this Court on October 9, 1997.

## II.

■■■ · To decide this case, we must interpret the Private Securities Litigation Reform Act of 1995 ("PSLRA"). This Court reviews questions of statutory interpretation de novo. See *United States v. Moore*, 73 F.3d 666, 668 (6th Cir.1996). Moreover, this Court reviews de novo a district court's dismissal of a complaint under Rule 12(b)(6). See *Valassis Communications v. Aetna Cas. & Sur. Co.*, 97 F.3d 870, 873 (6th Cir.1996). On a motion to dismiss, this Court must accept as true "well pleaded facts" set forth in the complaint. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987). Dismissal of a complaint is not proper "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Significantly, a federal

court of appeals is not restricted to ruling on the district court's reasoning, and may affirm a district court's grant of a motion to dismiss on a basis not mentioned in the district court's opinion. See *Danielsen v. Burnside–Ott Aviation Training Ctr.*, 941 F.2d 1220, 1230 (D.C.Cir.1991).

**A.**

To state a claim under § 10(b) of the Securities and Exchange Act of 1934 ("Securities Act") and Rule 10b–5, a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury. See *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1409 (6th Cir.1991). The Supreme Court has held that "scienter" is a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). As the Court has recognized, § 10(b) aims to proscribe "knowing or intentional misconduct." *Id.* at 193, 96 S.Ct. 1375. To establish a defendant's liability under § 10(b), a plaintiff must, as a threshold matter, allege in his complaint that the defendant acted with sufficient scienter. See *SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 111 (2d Cir. 1998).

Allegations of securities fraud must, as must allegations of fraud generally, satisfy the requirements of Rule 9(b) of the Federal Rules of Civil Procedure. See Fed. R.Civ.P. 9(b). Under Rule 9(b), when a plaintiff avers fraud or mistake, "the circumstances constituting fraud or mistake shall be stated with particularity." *Id.* Despite the application of the Rule 9(b) heightened pleading requirement to securities fraud cases, the Supreme Court recognized long ago that "litigation under Rule 10b–5 presents a danger of vexatiousness different in degree and kind from that which accompanies litigation in general." *Blue Chip Stamps v. Manor Drug Stores*,

421 U.S. 723, 739–44, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). As the Court then observed, groundless claims of securities fraud tended to delay the normal business activities of a corporate defendant while the plaintiff conducted extensive discovery of business documents in the hopes of finding relevant evidence. See *id.* at 741, 95 S.Ct. 1917.

In 1995, Congress concluded that Rule 9(b) had "not prevented abuse of the securities laws by private litigants." H.R. Conf. Rep. No. 104–369 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 818. Indeed, Congress echoed the concerns expressed by the Supreme Court in Blue Chips, noting that frivolous securities fraud litigation "unnecessarily increase[s] the cost of raising capital and chill[s] corporate disclosure, [and is] often based on nothing more than a company's announcement of bad news, not evidence of fraud." S.Rep. No. 104–98 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 690. On December 22, 1995, over the objection of the President, Congress amended the Securities Act through passage of the PSLRA. See Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67 (1995).

The PSLRA amendments to the Securities Act require the following:

> In any private action arising under this chapter in which the plaintiff may recover money damages on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2) (1998). The PSLRA provides that if a plaintiff does not meet this requirement, a court may, on any defendant's motion, dismiss the complaint. See 15 U.S.C. § 78u–4(b)(3) (1998). As courts have observed, the PSLRA did not change the scienter that a plaintiff must prove to prevail in a securities fraud

case but instead changed what a plaintiff must plead in his complaint in order to survive a motion to dismiss. See, e.g., *In re Glenayre Techs. Inc. Sec. Litig.*, 982 F.Supp. 294, 298 (S.D.N.Y.1997). Indeed, the PSLRA "nowhere defines what the 'required state of mind' is for any of the kinds of actions that might be brought" under the Securities Act. *In re Baesa Sec. Litig.*, 969 F.Supp. 238, 240 (S.D.N.Y. 1997).

### B.

Prior to the passage of the PSLRA, the Second Circuit applied the most stringent test as to how a plaintiff may plead scienter under § 10(b) or Rule 10b–5, requiring a plaintiff to either (1) allege facts constituting strong circumstantial evidence of conscious or reckless behavior by the defendant, or (2) allege facts showing the defendant's motive for committing fraud and the clear opportunity to do so. See *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994). Plaintiffs claim that the PSLRA simply adopted the Second Circuit pleading requirements for plaintiffs alleging violations of § 10b or Rule 10b–5, so that the PSLRA permits plaintiffs to survive a motion to dismiss by alleging recklessness or motive and opportunity. Defendants argue that in passing the PSLRA, Congress intended to create a pleading requirement more stringent than that applied by the Second Circuit, and that in accordance with congressional intent and legislative history, courts must interpret the PSLRA so that plaintiffs may survive dismissal only by alleging a "strong inference" of knowing or intentional conduct.

■ Setting aside the pre-PSLRA Second Circuit pleading test in favor of a plain interpretation of the PSLRA, we conclude that plaintiffs may plead scienter in § 10b or Rule 10b–5 cases by alleging facts giv-

ing rise to a strong inference of recklessness, but not by alleging facts merely establishing that a defendant had the motive and opportunity to commit securities fraud. Consequently, we must reject the reasoning of the district court to the extent it concluded that plaintiffs must "plead specific facts that create a strong inference of knowing misrepresentation on the part of the defendants" in order to establish a defendant's scienter in a securities fraud case brought under § 10(b) or Rule 10b–5.

### 1.

■ When interpreting a statute, we must begin with its plain language, and may resort to a review of congressional intent or legislative history only when the language of the statute is not clear. See *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). As noted above, the PSLRA plainly states that a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (1998). While § 78u–4 requires a plaintiff to allege facts giving rise to a "strong inference" of the "required state of mind," no provision of the PSLRA defines the "required state of mind" in cases involving § 10(b) or Rule 10b–5. See *In re Baesa*, 969 F.Supp. at 240. By its own terms, the PSLRA pleading standard does not purport to change the substantive law of scienter, or the required state of mind, for securities fraud actions.[5] See *Lirette v. Shiva Corp.*, 27 F.Supp.2d 268, 282 (D.Mass.1998). Since the reforms did not change the mental state required for liability under the Securities Act, the PSLRA requires a plaintiff, in essence, to plead facts giving rise to a "strong inference" of scienter. See *id.* at 282; *In re Glenayre*,

---

5. Indeed, Congress did act affirmatively in the PSLRA to change the standard of liability to intent or actual knowledge only in the context of certain "forward-looking" statements, but omitted to change the scienter requirement generally. See 15 U.S.C. § 78u–5(c) (1998) (requiring plaintiffs to show "actual knowledge" on the part of defendants alleged to have made misleading or untrue "forward-looking statements").

982 F.Supp. at 298. The PSLRA did not disturb the well-settled understanding that "scienter" is the requisite mental state for liability under § 10b or Rule 10b–5 cases. See *Hochfelder*, 425 U.S. at 193, 96 S.Ct. 1375.

Accordingly, before turning to legislative history and intent, this Court must look to what constitutes "scienter" under securities fraud law both before and after passage of the PSLRA to identify how a plaintiff may plead facts giving rise to a "strong inference" of scienter. Indeed, we assume that Congress was aware of the "contemporary legal context" surrounding the state of mind requirement for § 10(b) and Rule 10b–5 liability and, by its silence, left it undisturbed in the PSLRA. See *Cottage Savings Ass'n v. Comm'r*, 499 U.S. 554, 561–62, 111 S.Ct. 1503, 113 L.Ed.2d 589 (1991). As noted above, the Supreme Court has defined "scienter" as a "mental state embracing intent to deceive, manipulate or defraud." *Hochfelder*, 425 U.S. at 194, 96 S.Ct. 1375. In Hochfelder, the Court rejected the notion that negligent conduct could give rise to liability under § 10(b) or under Rule 10b–5. See *id.* at 214, 96 S.Ct. 1375. Significantly, the Court noted that while "scienter" refers to a mental state involving intent, "[i]n certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act."[6] *Id.* at 193 n. 12, 96 S.Ct. 1375. The Court declined to address whether, under some circumstances, reckless behavior could give rise to civil securities liability under § 10b and Rule 10b–5. See *id.*

After Hochfelder but prior to the passage of the PSLRA, virtually every circuit to consider the issue held that recklessness could amount to scienter under § 10b and Rule 10b–5. See, e.g., *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568–69 (9th Cir.1990); *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir.1977). Indeed, under current Sixth Circuit law, "recklessness satisfies the § 10(b)/Rule 10b–5 scienter requirement." *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1024 (6th Cir.1979). Significantly, courts adopting such an approach have relied on a stringent formulation of the term "recklessness" that does not allow for recklessness as a form of negligence. See, e.g., *Chill v. General Elec. Co.*, 101 F.3d 263, 268 (2d Cir.1996); *Mansbach*, 598 F.2d at 1024 n. 36 (noting that recklessness "falls somewhere between intent and negligence"). In Mansbach, this Court expressed generally that "recklessness [is] highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." 598 F.2d at 1025 (citing *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977)). Because it is clear that recklessness, understood as a mental state apart from negligence and akin to conscious disregard, may constitute scienter, we conclude that under the PSLRA, a plaintiff may survive a motion to dismiss by pleading facts that give rise to a "strong inference" of recklessness.[7]

---

**6.** Indeed, under the Model Penal Code, one "acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct." Model Penal Code § 2.02(c) (1994).

**7.** In their amicus brief, the American Institute of Certified Public Accountants express concern that allegations of securities fraud based on mere recklessness "will expose accountants and other perceived 'deep pocket' defendants to potential liability without, in the words of Congress, 'regard to their actual culpability.'" (Br. at 30.) However, we believe the question of whether recklessness suffices to prove scienter is well-settled. As we have observed, federal appellate courts have long held the view that, for the purposes of securities fraud, "recklessness" that is far from negligence and closer to a "lesser form of intent" constitutes scienter. *Sanders*, 554 F.2d at 793. We are unpersuaded by amici's characterization of the PSLRA as setting forth a uniform substantive standard of scienter as

■ On the other hand, evidence of a defendant's motive and opportunity to commit securities fraud does not constitute "scienter" for the purposes of § 10b or Rule 10b–5 liability. Indeed, those courts addressing motive and opportunity in Securities Act cases have held only that facts showing a motive and opportunity may adequately allege scienter, not that the existence of motive and opportunity may support, as scienter itself, liability under § 10b or Rule 10b–5. See, e.g., *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995); *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987) (noting that "a common method for establishing a strong inference of scienter is to allege facts showing" motive and opportunity). Consequently, we cannot agree that under the PSLRA, plaintiffs may establish a "strong inference" of scienter merely by alleging facts demonstrating motive and opportunity where those facts do not simultaneously establish that the defendant acted recklessly or knowingly, or with the requisite state of mind.[8] While facts regarding motive and opportunity may be "relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred," *In re Baesa*, 969 F.Supp. at 242, and may, on occasion, rise to the level of creating a strong inference of reckless or knowing conduct, the bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter. Thus, under a plain interpretation of the PSLRA as informed by well-settled law on the contours of the "scienter" requirement, we hold that plaintiffs may meet PSLRA pleading requirements by alleging facts that give rise to a strong inference of reckless behavior but not by alleging facts that illustrate nothing more than a defendant's motive and opportunity to commit fraud.

opposed to a procedural standard of heightened pleading.

8. We acknowledge that the Third Circuit recently provided a somewhat different inter-

**2.**

We therefore conclude that the district court applied an erroneous legal standard when it decided this case. In an attempt to divine the requirements of the PSLRA pleading rule, the district court overlooked well-settled principles of statutory construction and the unambiguous language of the PSLRA by first looking to the legislative intent and history of the statute to determine whether pre-PSLRA Second Circuit pleading standards should operate. First, the district court relied on a House Conference Report accompanying the PSLRA which explained that "[b]ecause the Conference intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard" and that "[f]or this reason, the Conference Report chose not to include in the pleading standard language relating to motive, opportunity, or recklessness." H.R. Conf. Rep. No. 104–369, at 31–41 (1995), reprinted in 1995 U.S.C.C.A.N. 730–40 & n. 23. Second, the district court observed that in passing the PSLRA, Congress overrode a veto unequivocally rejecting the legislation on the grounds that while the President was "prepared to support the high pleading standard of the U.S. Court of Appeals for the Second Circuit ... the conferees make crystal clear ... their intent to raise the standard even beyond that level. I am not prepared to accept that." 141 Cong. Rec. H15214–06, 15215 (1995). Finally, cases cited by the district court relied heavily on the fact that Congress considered adopting the Second Circuit test, but declined to do so. See S.Rep. No. 104–98, at 34 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 712. Indeed, Congress rejected a Senate bill including an amendment filed by Senator Specter which would have permitted plaintiffs to meet the new

pretation of the role of "motive and opportunity" under the PSLRA. See *In re Advanta Corp. Secs. Litig.*, 180 F.3d 525, 534–35 (3d Cir.1999).

pleading standard "by alleging facts to show that the defendant had both motive and opportunity to commit fraud or by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness by the defendant." 141 Cong. Rec. S9170 (daily ed. June 27, 1995.)

While these indicia of legislative purpose support the notion that courts are not to interpret the PSLRA as having adopted the Second Circuit pleading standard, we cannot approve the district court's conclusion that, consequently, plaintiffs must allege facts giving rise to a strong inference of knowing misrepresentation or intent to survive motions to dismiss. Under the district court's interpretation, courts would have to infer that Congress intended to replace then and currently prevailing scienter requirements, which include some form of recklessness, with a definition of scienter that excludes recklessness and limits scienter to knowing misrepresentation or intent.[9] As we have discussed, it is clear that Congress changed the pleading, but not the state of

mind, requirements applicable to § 10(b) and Rule 10b–5 cases. Thus, in erroneous reliance upon legislative history, the district court's interpretation disregards the plain language of the statute.[10]

Were we to affirm the district court's interpretation of the PSLRA, we would, in effect, change the definition of scienter currently applied by nearly every circuit in securities fraud cases. Such a result is untenable given that the PSLRA nowhere altered the state of mind requirements for securities fraud cases. Rather, it is clear that the PSLRA merely modified the pleading requirements by requiring plaintiffs to allege a "strong inference" of the requisite scienter, and did not change the level of intent necessary to trigger § 10(b) and Rule 10b–5 liability. Thus, we reject the position taken by the district court that a plaintiff must plead facts giving rise to a "strong inference of knowing misrepresentation or intent" to sustain a claim of § 10(b) and Rule 10b–5 securities fraud, and adhere to our conclusion that plaintiffs may continue to survive dismissal by

---

**9.** Although the district court cited a handful of cases in support of this proposition, we observe that subsequent decisions have replaced or weakened the force of those authorities. For example, the district court relied on an unreported opinion in *In re Silicon Graphics*, No. C96–0393, 1996 WL 664639, at *5–7 (N.D.Cal. Sept. 25, 1996), to restrict the pleading requirement to a showing of a strong inference of knowing misrepresentation. However, the court in In re Silicon Graphics issued a published decision one year later in the same case that expressly included "deliberate recklessness" in its definition of knowing or intentional misconduct. 970 F.Supp. 746, 756 (N.D.Cal.1997). The district court also cited *Norwood Venture Corp. v. Converse*, 959 F.Supp. 205, 208 (S.D.N.Y.1997), in support of its narrow interpretation of the pleading requirement. However, Judge Baer, the author of Norwood Venture, made clear in a later opinion that Norwood Venture "did not specifically reject the pre-PSLRA recklessness standard." *In re Glenayre Techs.*, 982 F.Supp. at 298. Finally, the district court relied on *Friedberg v. Discreet Logic, Inc.*, 959 F.Supp. 42 (D.Mass.1997), which stated that the "PSLRA has eliminated recklessness." *Id.* at 49 & n. 2. However, we note that the

District of Massachusetts is itself split on the issue. See *Lirette*, 27 F.Supp.2d at 282.

**10.** We observe that some aspects of the legislative history disclose Congress' intent to change pleading and not substantive requirements, and thus support the view that plaintiffs can survive a motion to dismiss by pleading a strong inference of recklessness. The House Conference Report itself refers to the inadequacy of the pleading requirements set out in Rule 9(b), and noted the "need to establish uniform and more stringent pleading requirements to curtail the filing of meritless lawsuits." H.R. Conf. Rep. No. 104–369, at 89 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 818. Viewed in its entirety, the legislative history is ambiguous and does little to accurately reveal Congress' intent here. Where the legislative history of a statute is contradictory and unenlightening, courts should hesitate to rely on it and instead should look to the statute itself. See *Rust v. Sullivan*, 500 U.S. 173, 185–86 & n. 3, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 412 n. 29, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

pleading facts that give rise to a "strong inference of recklessness" of the kind required for securities fraud liability.

## C.

■ Having identified the proper boundaries of the PSLRA pleading standard, we must now apply that standard to the facts of this case. Plaintiffs allege that the individual Defendants stood to receive greater compensation if Comshare's stock prices increased, and that the individual Defendants did profit by selling many of their shares at artificially inflated prices during the class period to the detriment of Plaintiffs. (Complaint at ¶¶ 14, 20–21, 23–27.) These allegations largely tend to illustrate that Defendants had the motive and opportunity to commit securities fraud. See, e.g., *Acito*, 47 F.3d at 53–54. Indeed, the charge that corporate officers engaged in insider sales at unusual or suspicious levels "is probative of motive." *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir.1999). However, under the PSLRA pleading rule as we have defined it, claims of motive and opportunity do not, without more, suffice to give rise to a "strong inference" of scienter. While the allegations set forth in the Complaint may give rise to a strong inference that individual Defendants had a motive and the opportunity to commit securities fraud and may be relevant on the issue of recklessness, see *In re Baesa*, 969 F.Supp. at 242, in this case they do not, in our view, give rise to a strong inference that Defendants acted with recklessness, or that the revenue recognition errors at the heart of this case were "so obvious that any reasonable man would have known of [them]." *Mansbach*, 598 F.2d at 1025. Accordingly, we find that Plaintiffs failed to adequately plead scienter and that, in the final analysis, the district court properly dismissed the Complaint.

■ The failure to follow GAAP is, by itself, insufficient to state a securities fraud claim. See, e.g., *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357,

362 (1st Cir.1994); *Fine v. American Solar King Corp.*, 919 F.2d 290, 297–98 (5th Cir.1990). While Plaintiffs claim Defendants "were aware of, or were recklessly indifferent to" the revenue recognition errors, they allege no facts to show that Defendants knew or could have known of the errors, or that their regular procedures should have alerted them to the errors sooner than they actually did. (Complaint ¶¶ 82, 93.) Rather, their allegations rest on mere "information and belief," and cannot support a strong inference of scienter. See 15 U.S.C. § 78u–4(b)(1) (1998) ("[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."); see also *Maldonado v. Dominguez*, 137 F.3d 1, 9 (1st Cir. 1998); *Luce v. Edelstein*, 802 F.2d 49, 54 n. 1 (2d Cir.1986). Indeed, Plaintiffs have not alleged specific facts that illustrate "red flags" that should have put Defendants on notice of the revenue recognition errors, or that demonstrate reasons for Defendants to have questioned the revenue reporting of its UK subsidiary. Cf. *In re Health Management Sec. Litig.*, 970 F.Supp. 192, 203 (E.D.N.Y.1997) (finding strong inference of recklessness where defendant allegedly failed to follow proper audit procedures, that GAAP violations led to material misstatements, and that defendant ignored numerous "red flags").

■ Although Plaintiffs speculate that it is likely that Defendants knew of the GAAP violations because they occurred over a long period of time, claims of securities fraud cannot rest "on speculation and conclusory allegations." *San Leandro Emergency Med. Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996). Similarly, Plaintiffs' claim that a subsequent revelation of the falsehood of previous statements implies scienter lacks merit, since "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Stevelman*, 174

F.3d at 84 (*quoting Acito*, 47 F.3d at 53). Moreover, the mere lack of records documenting the finality of sales in Comshare's UK subsidiary could not, without a showing that Comshare normally expected to see such documents from its subsidiaries, imply recklessness. See *Chill*, 101 F.3d at 270. Indeed, this Court should not presume recklessness or intentional misconduct from a parent corporation's reliance on its subsidiary's internal controls. See *id.* at 271; *In re Baesa*, 969 F.Supp. at 242 (observing that "a subsidiary's fraud cannot be automatically imputed to its corporate parent (Baesa), let alone to the parent's principal officer (Beach)").

Because Plaintiffs have failed to plead facts that show that the revenue recognition errors at Comshare's UK subsidiary should have been obvious to Comshare or that Comshare consciously disregarded "red flags" that would have revealed the errors prior to their inclusion in public statements, we conclude the Complaint fails to allege facts that give rise to a strong inference of scienter under § 10(b) and Rule 10b–5. We observe that in their brief, Plaintiffs sought an opportunity to replead on the grounds that when they filed the Complaint, very few courts had interpreted the pleading standards of the PSLRA. (Appellants' Br. at 49.) While we agree that the PSLRA pleading standards were not well-defined at the time Plaintiffs filed their complaint and note that numerous courts have granted the opportunity to replead on those grounds, see, e.g., *In re Baesa*, 969 F.Supp. at 243, counsel stated unequivocally at oral argument that Plaintiffs did not wish to replead their case. Accordingly, we do not disturb the district court's dismissal with prejudice of Plaintiffs' complaint for failure to state a claim.[11]

11. Although Plaintiffs allege that the individual Defendants are liable as "controlling persons" of Comshare, Plaintiffs can only hold individual Defendants liable under that theory if they were "controlling persons" of an entity that has violated the Securities Act. See *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983) (recognizing that "controlling person" liability is derivative). Because we conclude that Plaintiffs have not stated a claim that Comshare violated the Securities Act, we do not reach Plaintiffs' claim to "controlling person" recovery.

### III.

For the reasons set forth above, we AFFIRM the judgment of the district court.