### In re FORD MOTOR CO. SECURITIES LITIGATION

No. 00–74233.

United States District Court, E.D. Michigan, Southern Division.

Dec. 12, 2001.

Patrick E. Cafferty, Miller, Faucher, Ann Arbor, MI, for Plaintiff.

Jerome S. Fortinsky, Stuart Baskin, Shearman & Sterling, New York City, Francis R. Ortiz, Thomas G. McNeill, Dickinson Wright, Lawrence G. Campbell, Dickinson Wright, Detroit, MI, for Defendants.

Patrick E. Cafferty, Miller, Faucher, Andrew J. Morganti, Ann Arbor, MI, for Movants.

## AMENDED ORDER AND OPINION GRANTING DEFENDANT'S MOTION TO DISMISS [33–1]

TARNOW, District Judge.

### I. Introduction

Plaintiffs, consisting of professional investors such as trust funds and some individuals, who purchased shares between March 31, 1998 and February 14, 2000, filed this consolidated complaint alleging that Ford Motor Company and Ford executives ("Ford") committed securities fraud in violation of sections 10(b) and 10(b)(5) of the Securities Exchange Act as amended by the Private Securities Litigation and Reform Act ("PSLRA"). 15 U.S.C. § 78u–4(b)(2).[1] Plaintiffs allege that Ford made misleading statements about the quality and safety of the Explorer sports utility vehicle. Further, plaintiffs contend that this fraud was exacerbated[2] by Ford's financial statements, which should have, but did not, offset profits by future litigation and recall costs that would be incurred due to problems with the Explorer.

---

1. In an order entered by the Court, the Public School Teachers' Pension and Retirement Fund of Chicago was appointed Lead Plaintiff.

2. In an Errata issued December 12, 2001, the court replaced the word "exasperated" with the term "exacerbated." While the terms are synonyms, "exasperate" is considered obsolete.

Ford has filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim: Specifically, pursuant to the PSLRA for failure to plead a strong inference, or at least, recklessness. For the reasons stated below, the Court GRANTS the defendant's motion to dismiss.

## II. Background

### A. Factual Background

Ford developed the Explorer to replace the Bronco II line of sports utility vehicle ("SUV"). Explorers sold extremely well and provided a large portion of Ford's profits during the 1990's. The Explorer reportedly had problems with its suspension and high-center of gravity since its inception similar to those experienced by the Bronco II's.

Explorer trucks were equipped with Firestone ATX tires, which had a "C" heat/temperature resistance rating. While still safe, a "C" rating is the lowest rating under the National Highway Traffic Safety Administration ("NHTSA") Uniform Tire Quality Grading System. This low rating is indicative of the inability to resist heat-buildup as well as "A" and "B" rated tires. When Ford introduced its new Explorer equipped with the Firestone ATX tires, it recommended tire inflation of 26 psi. 26 psi was an amount less than that recommended by Firestone for the Crated tires. Low tire pressure decreases a tire's ability to resist heat, which is a cause of tread separation.

In the 1990's, Ford began to receive consumer complaints about the Explorer, alleging tire tread separations, tire failures and "single event" rollover accidents. The first such complaint occurred in 1992. By 1993, at least five lawsuits against Ford and Firestone had been filed related to ATX tire failures. By 1999, approximately 50 lawsuits had been filed for injuries or deaths resulting from Explorer crashes due to tire failures. Approximately three million Ford Explorers were sold during that period.

In 1998, numerous complaints about the tires and the propensity for roll-over accidents were lodged in Saudi Arabia and Venezuela. The company concluded that this was due in part to the tires and in part to the driving conditions in those countries. Consistent with this diagnosis, the tires were altered in those countries with the addition of a nylon cap to diminish these dangerous tendencies.

On August 9, 2000, Ford and Firestone issued an unprecedented "joint recall" of more than 6.5 million ATX tires. According to Ford, the company's participation was voluntary and made only to speed the provision of replacement tires. Federal law indicates that the tire manufacturer is responsible for a tire recall. 49 U.S.C. § 30120(b). The events surrounding the recall led to investigations by various safety regulatory agencies and a decline in Explorer sales in late 2000 and early 2001.

Beginning on September 22, 2000, plaintiffs filed a series of class action complaints, alleging that Ford made material misstatements and omissions prior to August 9, 2000 in violation of Section 10(b) and 10(b)(5) of the Securities Exchange Act. The relevant class period in this complaint is March 31, 1998 through August 31, 2000. These cases were consolidated on February 14, 2001.

## III. Standard of Review

■ To state a claim under § 10(b) of the Securities Act and Rule 10b–5 a plaintiff must allege, in connection with the purchase or sale of securities: (1) the misstatement or omission of a material fact; (2) made with scienter; (3) upon which the plaintiff justifiably relied; and (4) which proximately caused the plaintiff's injury. *In re Comshare, Inc.* 183 F.3d 542, 548 (6th Cir.1999).

 Congress heightened the pleading standard for securities fraud with the passage of the Private Securities Litigation Reform Act ("PSLRA"). *See* 15 U.S.C. § 78u–4 & 5. The PSLRA was adopted with the purpose of creating uniform pleading standards in securities fraud actions and to reduce frivolous suits.[3] *See Helwig v. Vencor,* 251 F.3d 540, 547 (6th Cir.2001)(en banc). The statute constructively established a presumption of correct management. It attempted to rid courts of cases arising from market fluctuation, while preserving the anti-fraud function of the Securities Exchange Act of 1934. In the first Sixth Circuit case to address the PSLRA, *Comshare,* the court stated:

> the PSLRA did not change the scienter that a plaintiff must prove to prevail in a securities fraud case but instead changed what a plaintiff must plead in his complaint in order to survive a motion to dismiss.

*Comshare,* 183 F.3d at 548–49. "Under the PSLRA, a plaintiff must now 'state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'" *Helwig,* 251 F.3d 540, 548(quoting 15 U.S.C. § 78u–4(b)(2))(emphasis in original).

 A fact sensitive analysis of the complaint must be undertaken in light of *Helwig* and *Comshare. Helwig,* 251 F.3d at 550. The focus of the analysis is to determine whether the facts as pled produce a strong inference that the defendant acted at least recklessly. *Helwig,* 251 F.3d at 551. "'[R]ecklessness [is] highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.'" *Comshare,* 183 F.3d at 550, *citing Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1025. "While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable... Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences." *Comshare,* 183 F.3d at 550.

## IV. Analysis

Plaintiffs' theory of liability is premised on Ford's omission of material information which allegedly transformed seemingly innocuous and accurate statements into misleading statements. The theory is that Ford should have disclosed information regarding the danger of Firestone ATX tires and accounted for future costs of related lawsuits and recalls. By omitting information about this contingent liability, plaintiffs argue, Ford's accurate statements about sales of Explorers and its bolstering statements regarding corporate responsibility became misleading to investors. These investors remained unaware of the looming costs and liability that would accompany the tires and, consequently, suffered from these alleged misrepresentations.

### A. Failure to state a claim

 Ford argues that the complaint should be dismissed with prejudice pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim.[4] According to Ford, the

---

3. *See also,* Nicole Briski, *Pleading Scienter Under The Private Securities Litigation Reform Act of 1995: Did Congress Eliminate Recklessness, Motive, and Opportunity,* 32 Loy. U. Chi. L.J. 155, 164–65 (2000).

4. Ford also argues that the Court should dismiss the case pursuant to Fed.R.Civ.P. 8, because the complaint is not a short plain statement of the claims. This argument only serves to illuminate the tension between Rule 8 and the PSLRA heightened pleading stan-

company had no duty to disclose soft information about unforeseeable costs. Further, the company argues that its statements about earnings and sales were historically accurate, the statements about safety and good corporate citizenship are non-actionable puffery, and the loss contingency allegations failed to state a claim.

Ford argues that it had no duty to disclose information about possible future costs arising from the ATX tire pursuant to the Sixth Circuit's holding in *In re Sofamor Danek Group, Inc.*, 123 F.3d 394 (1997)(en banc). Sofamor Danek was a company primarily in the business of developing, manufacturing and marketing spinal implant devices for surgical use. Some of the company's primary products were bone plates and sacral screws. While these devices had been approved by the United States Food and Drug Administration ("FDA") for certain uses, utilization for "pedicular attachment" was considered a new use and would require stringent "pre-market approval." The FDA warned Sofamor Danek and other companies that they would face regulatory actions, if they marketed the device for the new use without prior approval. Sofamor Danek alluded to this warning in their prospectus and the threat that it might pose to sales. The company, however, continued marketing practices which allowed doctors access to the product. Doctors were free to use the devices for pedicular attachment, despite the marketing prohibition.

In 1993, a television program critical of the use of the product for pedicular attachments aired. Shortly after, the FDA issued a report outlining the danger of pedicular screws. Consequently, the value of Sofamor Danek stock dropped giving rise to a lawsuit by stockholders alleging stock fraud.[5] The plaintiffs in *Sofamor Danek* alleged that the company and certain officers "made deceptive and materially false and misleading statements which, coupled with the defendants' failure to disclose information that allegedly ought to have been disclosed, caused the company's stock to trade at artificially inflated prices." *Sofamor Danek*, 123 F.3d at 399. The *Sofamor Danek* plaintiffs' theory of liability was partly based on their belief that the company had a duty to disclose information that a certain distributor was not going to meet its purchase commitments of the product due to decreased demand for pedicular screws and doctors' fear of future litigation. The district court dismissed the case. The Sixth Circuit upheld the dismissal after finding that the company had no duty to disclose. The *Sofamor Danek* court recognized that the company informed the public of the warning letter that it received from the FDA. The Court found that there was no further duty to disclose "soft information" such as predictions regarding future regulatory actions or losses the company would suffer as a result. The Court stated: "this illustrates [ ] why predictions not 'substantially certain to hold,' like most matters of opinion, simply do not come within the duty of disclosure." *Sofamor Danek*, 123 F.3d at 402, *quoting Starkman v. Marathon Oil Co.*, 772 F.2d 231, 241 (6th Cir.1985).

Ford argues that *Sofamor Danek* stands for the proposition that a company has no independent duty to disclose information that is not substantially certain to hold. Ford recognizes that there is an affirmative duty of disclosure if: (1) created by SEC statute or rule; (2) there is insider trading; or (3) there was a prior statement

dards. In this case, the complaint, while long, is a valid attempt to comply with Rule 8 and the PSLRA.

**5.** It should be noted that this case was initiated and decided prior to the enactment of the PSLRA.

of material fact that is false, inaccurate, incomplete or misleading in light of the undisclosed information. The company argues that none of these conditions were present in this case. A recall and litigation arising from the ATX tires were not substantially certain to hold. A recall was not foreseeable, especially since the tire company is responsible for tire recalls. 49 U.S.C. § 30120. Therefore, Ford reasons, no duty to disclose was created.

The plaintiffs respond by arguing that this case is not a "duty-to-disclose" case but a duty-to-disclose-fully case. Unlike the duty to disclose case *Sofamor Danek,* where the public was informed of pending FDA actions, the public was not made aware of the dangers of the Explorer. The plaintiffs distinguish the cases further, stating that this case is dissimilar, because they do not concede the accuracy of Ford's financial statements, which they argue should have counted an offset for the future costs of a tire recall. Thus, plaintiffs conclude this action is unlike *Sofamor Danek.*

The plaintiffs then argue that this case is akin to *Helwig v. Vencor.* In *Helwig,* the Sixth Circuit distinguished the *Sofamor Danek* duty to disclose from a distinct duty to disclose fully. The defendants in *Helwig* publicly stated that they were comfortable with earnings estimates made prior to the passage of the Balanced Budget Act, despite knowledge that the Act, if passed, would have detrimental effects on the company's viability. Simultaneously, the defendant company warned its employees of impending hard times that would result from the passage of the Act. The Sixth Circuit reversed a district court dismissal of the securities fraud claim, distinguishing the case from *Sofamor Danek* and *Starkman.* The *Helwig* Court recognized that the non-disclosure cases survived the passage of the PSLRA, finding that a company's silence, absent a duty to disclose, is not misleading under Rule 10b–5. *Helwig,* 251 F.3d 540, 560. When a company chooses to speak on an issue though, it is required to provide complete and non-misleading information. *Id.* The court stated:

"[w]ith regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths." *Id.*

In the present case, plaintiffs argue that Ford chose to speak about safety and corporate responsibility, giving rise to a duty to fully disclose information on those topics. Under *Helwig,* the plaintiffs contend, Ford had a duty to disclose the problems with the SUV and account for future costs. The plaintiffs argue that Ford failed to make these disclosures fully. Thus, according to their theory, the case should survive a motion to dismiss under *Helwig.*

The Court disagrees. The statements identified in the complaint as allegedly giving rise to Ford's duty to disclose are dissimilar to those which triggered a duty in *Helwig.* In *Helwig* the company made statements that it was unsure how the Balanced Budget Act specifically would effect the company. This gave rise to a duty to disclose information fully on that specific topic, in light of the conflicting statements that the company made to employees regarding the adverse effects of the Act. In this case, the plaintiffs identify numerous statements that are vague, corporate puffery, or accurate. These statements include:

¶ 74 "on April 3, 1998, Ford issued a press release stating 'Ford's quartet of sport utility vehicles ... set a March sales record of 59,356;"

¶ 75 "...Ford reported its first quarter 1998 results via a release stating: Ford

has increased its year-over-year earning for eight consecutive quarters . . . ;"

¶ 78 "Ford issued a press release stating 'In the increasingly competitive sport utility market, Explorer increased the sales margin over its closest competitor with sales of 36,548 (up 10%)—the best May since 1995.'"

Other allegedly actionable statements include:

¶ 64 "we are taking across-the-board actions to improve our quality;"

¶ 92 "Ford Motor Company recognizes an essential business need to be a good and responsible corporate citizen everywhere the company operates."

The above statements do not compare to the misleading and incomplete statements made in *Helwig*.

In *Helwig*, the actionable statements were specific to the topic of the Balanced Budget Act and contradicted by the internal report. A statement by Ford that it is "taking across the-board-actions to improve [ ] quality" is not specific. This vague statement does not obligate Ford to disclose information about a potential recall of the ATX tires in the future. Unlike in *Helwig*, where the company's public statement were directly related to the withheld adverse information, Ford's public statement do not relate.

Further, Ford's public statements are not contradicted by allegations in the complaint. Using the same example from the complaint, Ford's statement that it is taking steps to improve quality of vehicles in general is not inconsistent with their being problems specific to one particular SUV. This is compared with *Helwig* where the company's public statement that it did not know the effect of the Act was directly contradicted by the internal memo regarding the adverse effect of the Act.

■ Since plaintiffs have not alleged actionable false statements, then, to prevail they must show a failure to disclose that which they had a duty to disclose. As a duty to disclose case, Ford was not obligated to disclose information regarding unforeseeable recall costs pursuant to *Sofamor Danek* and *Starkman*. Companies are under no duty to disclose predictions that are not substantially certain to hold. *Starkman*, 772 F.2d at 241. Although Ford must be accountable and speak fully and truthfully as to matters it chooses to speak about, the company need not publicly conjecture about every scenario and every item that it has in stock. Costs associated with a recall were not substantially certain to hold. Tire recalls are conducted by tire manufacturers as a matter of law. 49 U.S.C. § 30120(b). Ford's participation in the recall was voluntary. Ford's actions and omissions may provide a strong basis for products liability cases, but they do not create a duty to disclose in the securities context.

Because Ford had no duty to disclose, plaintiffs' theory of the case is untenable. The plaintiffs' theory focuses on a litany of statements that are historically accurate or corporate puffery. The parties disagree about the standard to apply when analyzing historically accurate data alleged to be actionable. Ford argues that truthful information is not a material misstatement as required to state a securities fraud claim. *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1202 (1st Cir.1996) (stating "accurate reports of past successes do not themselves give rise to a duty to inform the market whenever present circumstances suggest that the future may bring a turn for the worse."). Plaintiffs disagree arguing that the Ninth Circuit articulated the appropriate standard in *In re Convergent Technologies Sec. Litig.*, 948 F.2d 507 (9th Cir.1991). *Convergent* held that the proper gauge is not the truth of the statements but "the ability of the material to accurately inform rather than mislead the prospective buyers." *In re Convergent*,

948 F.2d at 512. Because there was no duty to disclose, the Court finds that under either standard Ford's historically accurate sales data were not misleading as pled in this case.

The other alleged misleading statements without the benefit of this larger theory were puffery. These statements do not provide the basis for a securities fraud action. For these reasons, this court finds that the plaintiffs fail to state a claim.

## B. Failure to Plead Scienter

■ Even if this case were not dismissed for the above reasons, plaintiffs fail to satisfy the heightened pleading requirements of the PSLRA. As the court held in *Comshare*, in a post-PSLRA securities fraud, the facts as pled must show a strong inference of scienter. *Comshare*, 183 F.3d at 550. The Circuit elaborated on this standard in *Helwig*, holding that the facts must give rise to a strong inference of at least recklessness. *Helwig*, 251 F.3d at 551.[6] The *Helwig* Court went on to adopt the First Circuit's non-exhaustive list of factors relevant to scienter as enumerated in *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir.1999). The *Greebel* factors are:

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

Applying these factors, while close, results in a conclusion in favor of Ford's motion to dismiss.

In this case, there is no allegation of insider trading.[7] There is no divergence between internal reports and external statements on the same subject. The tim-

---

**6.** In their pleadings, both parties allude to *In re Lason, Inc. Sec. Litig.*, 143 F.Supp.2d 855 (E.D.Mich.2001), a case in which this Court denied Lason's motion to dismiss a securities fraud action. *Lason* is distinct from this case because the Court determined that the *Lason* complaint alleged that the corporation's statements were false when made, not that the statements were accurate, but misleading due to a failure to disclose. Unlike *Ford*, *Lason* was a failure to disclose fully case, as contemplated in *Helwig*. Further, the nine factors adopted in *Helwig* favored the plaintiffs in *Lason* more than in this case.

**7.** In fact, the company was a major purchaser of its own stock during the class period, buy-

ing approximately $3 billion worth from 1998—2000. However, despite Ford's arguments to the contrary, this is an ambiguous factor. Perhaps such purchases could be understood to signify that the company could not have been acting fraudulently since it would be both the offender and the victim, as Ford argues. However, it could also be understood as the company's attempt to stabilize its value in a self-interested manner. The amount of the stock purchased by the company in 2000 (the end of the class period) is more than the sum of that purchased in 1998 and 1999.

ing of statements is not an issue, because the statements made by the company were consistent with any later disclosures. Arguably, there is one statement made by Ford that was inconsistent. Ford's use of ATX tires on its Explorer was publicly challenged during 2000. In response Ford stated that it was "extremely satisfied with the safety record of these vehicles." Shortly after, the company participated in a massive recall of the tires. The Court, however, agrees with Ford's argument that read in context, this statement is consistent with the automaker's statements prior to and subsequent to the recall. Thus, timing of statements later found to be inconsistent weighs in favor of Ford. The fourth factor weighs in favor of Ford because there is no allegation of bribery by a top company official.

The fifth factor, the existence of ancillary lawsuits, favors plaintiffs. The complaint does not clearly identify lawsuits alleging fraud against Ford, nor the secret nature of the settlements, if any. This factor does not rise to the level of a strong inference of scienter.

The sixth factor favors Ford. There is no indication that Ford disregarded the most current factual information before making statements.

Despite plaintiffs' argument that Ford violated Generally Accepted Accounting Principles ("GAAP"), the seventh factor favors Ford. The company convincingly argues that it was not required to account for a loss contingency, because the amount of liability could not be reasonably estimated. The tire company was responsible for the recall. Further, Ford was not required to disclose such unforeseeable information as indicated in the discussion *supra*. Even if the company did violate

GAAP, "the failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." *Comshare,* 183 F.3d 542, 553 (citations omitted).

The eighth factor regards the personal interest of certain directors in not informing disinterested directors of an impending sale of stock. This factor favors Ford. There are no allegations in the complaint about the sale or impending sale of stock. In fact, as stated *supra,* Ford purchased a great deal of its own stock. Thus, directors had no interest in withholding information about an impending stock sale from disinterested directors.

The ninth factor, regarding self-interested motivation of defendants in the form of saving their salaries or jobs, favors plaintiffs. The possible self-interest of any defendant in combination with other factors in support of plaintiffs cannot transform Ford's vague, accurate, and irrelevant statements into the basis of a securities claim. Based on these factors, this Court concludes that plaintiffs failed to plead a strong inference of scienter.[8]

## V. Conclusion

For the reasons stated above:

IT IS ORDERED that defendants' motion to dismiss [33–1] is GRANTED. This case is DISMISSED WITH PREJUDICE.

---

**8.** Ford argues that this case must also be dismissed pursuant to *Comshare,* because plaintiffs failed to specifically plead that Ford executives had knowledge of any of the facts giving rise to the claim. However, the *Comshare* court explicitly did not reach the issue of "controlling person" derivative liability. *Comshare,* 183 F.3d at 554 n. 11.