In re HAYES LEMMERZ INTERNATIONAL, INC. EQUITY SECURITIES LITIGATION

and

Pacholder High Yield Fund, Inc., Copernicus Euro CDO–I B.V., Topsail CBO, Ltd., TCW Linc III CBO, Ltd, and TCW Leveraged Income Trust IV, L.P., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Ranko CUCUZ, William Shovers, D.N. Vermilya, David Ying, Anthony Grillo, Paul Levy, Jeffrey Lightcap, Cleveland Christophe, Andrew Heyer, Horst Kukwa–Lemmerz, Wienand Meilicke, John Rodewig, Ray Witt, Kpmg, LLP, Cibc World Markets Corp, and Credit Suisse First Boston Corporation, Defendants.

Nos. 01–CV–73433, 02–CV–71778.

United States District Court,
E.D. Michigan,
Southern Division.

July 21, 2003.

**1010**

Elwood S. Simon, John P. Zuccarini, Birmingham, MI, Daniel A. Osborn, Beatie & Osborn, New York, NY, for Helen Korsinsky.

Stephen E. Glazek, Todd R. Mendel, Barris, Sott, Detroit, MI, James B. Brady, Young & Basile, Troy, MI, Stephen E. Glazek, Todd R. Mendel, Steven C. Kohl, Howard & Howard, Bloomfield Hills, MI, Philip A. Brown, Vorys, Sater, Columbus, OH, Michael M. Jacob, Robert E. Forrest, Raymond & Prokop, Southfield, MI, for Defendants.

## OPINION AND ORDER

TARNOW, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION .................................................1011

II. BACKGROUND....................................................1011
 A. *Substantive Facts* .................................................1011
 B. *The Parties* ....................................................1011
 C. *Procedural History* .................................................1012

III. STANDARD OF REVIEW .............................................1012

IV. ANALYSIS .......................................................1013
 A. *Hayes: Four Motions to Dismiss For Failure to State a Claim* ...........1013
 1. Section 10(b) Claim Against KPMG and the *Hayes* Individual Defendants ......................................................1014
 a. *Individual Defendants' arguments* ..............................1014
 b. *Plaintiffs' response* ..........................................1016
 c. *Analysis* ...................................................1018
 2. Section 20 Claim Against the Individual Defendants ....................1021

 B. *Pacholders: Six Motions to Dismiss For Failure to State a Claim* ........1023
 1. Section § 10(b) Claim Against Six Defendants (Cucuz, Shovers, Vermilya, Rodewig, Witt, and Christophe) and KPMG ...................1023
 2. Section 18 Claim Against KPMG and the *Pacholders* Individual Defendants .....................................................1024
 3. Section 12 Claim Against CIBC and CSFB ...........................1026

4. Section 12 Claim Against Cucuz and Shovers .......................... 1029
5. Section § 20 Claim Against Cucuz, Shovers, Vermilya, Christophe,
 Witt, and Rosewig, and Section § 15 as to all of the above minus
 Vermilya ........................ : ......................................... 1029

C. *Motion to Dismiss for Insufficiency of Service of Process by Defendants Kukwa–Lemmerz and Meilicke* .............................. 1030

V. **CONCLUSION** .................................................. 1033

## I. INTRODUCTION

Plaintiffs in both of the above captioned cases held securities in Hayes Lemmerz International, Inc. ("Company").[1] The first case, *In re Hayes,* involves the stockholder plaintiffs ("*Hayes*"). The second case, *Pacholders, et al. v. Cucuz, et al.,* involves the bondholders ("*Pacholders*"). Both sets of Plaintiffs are suing on behalf of themselves and all others similarly situated.[2]

This opinion will address Defendants' ten motions to dismiss in both cases.[3] Specifically, there are nine motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and one motion to dismiss under Federal Rule of Civil Procedure 12(b)(5) for insufficiency of service of process. The Court held oral argument in both cases on the same day because, while not consolidated, the cases involve most of the same Defendants, and many of the issues overlap.

## II. BACKGROUND

### A. *Substantive Facts*

As noted above, Plaintiffs were either stock or bondholders in the Company. The putative class in *Hayes* covers stockholders between June 3, 1999 and December 13, 2001 ("*Hayes* Class Period"). *Pacholders'* putative class covers bondholders between June 3, 1999 and September 5, 2001 ("*Pacholders* Class Period").

On September 5, 2001, the Company announced that it had discovered accounting errors and its financial statements would have to be restated for the fiscal year that ended January 31, 2001 ("FY 2000") and the first fiscal quarter of 2001 that ended April 30, 2001.

On December 13, 2001, the Company announced the restatement process was substantially complete, and the results from the fiscal year that ended January 31, 2000 ("FY 1999") would also have to be restated.

On February 19, 2002, the Company filed restated annual financials for FY 1999, FY 2000, and the first quarter of FY 2001. The new statements: (a) reduced previously reported net income of $65.1 million to $47.6 million for FY 1999 (a 26.8% reduction); (b) increased the previously reported $41.8 million net loss for FY 2000 to $186.2 million (a 445 % increase); and (c) increased the previously reported first quarter 2001 loss of $7.6 million to $63.7 million (an 838% increase).

### B. *The Parties*

Hayes Lemmerz International, Inc. ("Company") is described as follows:

---

1. The Company filed for bankruptcy on December 5, 2001, so proceedings directly against the company were stayed. Consequently, the Company is not named in either Amended Complaint. At oral argument, the Company was still in bankruptcy.

2. The parties have fully briefed motions to certify a class action, but those motions will be addressed at a later proceeding.

3. There are four dismissal motions in *Hayes* and six in *Pacholders*.

Hayes is one the world's leading suppliers of automotive and commercial highway wheels, brakes, powertrain, suspension, structural and other lightweight components. It supplies such components to domestic and foreign automobile manufacturers, including General Motors, Ford, and DaimlerChrysler (*Pacholders* Compl. ¶ 27).

There are seven Defendants named in both suits, who can be grouped as follows:

1) Ranko Cucuz (Chairman)
2) William Shovers (CFO and Chief Accounting Officer) and D.N. Vermilya (Corporate Controller and Chief Accounting Officer)
3) John Rodewig, Ray Witt, and Cleveland A. Christophe (Directors and Audit Committee Members) ("Audit Committee Defendants").
4) KPMG (the Company's accounting firm)

Cucuz, Shovers, and Vermilya will be referred to as the "Management Defendants," while Rodewig, Witt, and Christophe will be referred to as the "Audit Committee Defendants." When referring to both the Management and Audit Committee Defendants collectively, they will be referred to as the "*Hayes* Individual Defendants."

*Pacholders* includes eleven additional Defendants: the other seven Board members, (David Ying, Anthony Grillo, Paul Levy, Jeffrey Lightcap, Andrew Heyer, Horst Kukwa–Lemmerz, and Wienand Meilicke), CIBC World Markets Corp. ("CIBC"), and Credit Suisse First Boston ("CSFB"). CIBC and CSFB are investment banks that provided financial advisory and underwriting services to the Company.

Defendants Cucuz, Shovers, Vermilya, Ying, Grillo, Levy, Lightcap, Christophe, Kukwa–Lemmerz, Meilicke, Rodewig, and Witt will be referred to collectively as the "*Pacholders* Individual Defendants."[4] Defendants CIBC and CSFB will be referred to collectively as the "Underwriter Defendants."

### C. *Procedural History*

The *Hayes* Plaintiffs filed their original complaint on September 6, 2001, and they filed an amended complaint on May 10, 2002. The *Pacholders* Plaintiffs filed their complaint on May 4, 2002 and an amended complaint on July 1, 2002.

The *Hayes* Defendants filed their various motions to dismiss between September 30, 2002 and November 21, 2002. The *Pacholders* Defendants filed their motions to dismiss between September 19, 2002 and November 18, 2002.

The Court held oral argument on February 11, 2003.[5] The Court took the motions to dismiss under advisement.

### III. STANDARD OF REVIEW

The following standard or review is taken from this Court's decision in *In re Ford Co. Securities Litig.*, 184 F.Supp.2d 626, 629–30 (E.D.Mich.2001), *appeal docketed*, No. 02–1670 (6th Cir. May 30, 2002):

> To state a claim under § 10(b) of the [Securities Exchange Act of 1934 (the "Exchange Act")] and Rule 10b–5 [17 C.F.R. 240.10b–5], a plaintiff must allege, in connection with the purchase or sale of securities: (1) the misstatement

---

4. According to Plaintiffs, Defendant Heyer was served, but he has not responded or filed a motion to dismiss. Therefore, Plaintiffs claims against him will not be addressed in this opinion.

5. The *Pacholder* Plaintiffs also filed a Motion for Partial Summary Judgment on December 30, 2002. At oral argument, the Court deemed the motion premature and dismissed it without prejudice.

or omission of a material fact; (2) made with *scienter;* (3) upon which the plaintiff justifiably relied; and (4) which proximately caused the plaintiff's injury. *In re Comshare, Inc.* 183 F.3d 542, 548 (6th Cir.1999).

Congress heightened the pleading standard for securities fraud with the passage of the Private Securities Litigation Reform Act ("PSLRA"). *See* 15 U.S.C. § 78u–4 & 5. The PSLRA was adopted with the purpose of creating uniform pleading standards in securities fraud actions and to reduce frivolous suits.[6] *See Helwig v. Vencor,* 251 F.3d 540, 547 (6th Cir.2001) (en banc). The statute constructively established a presumption of correct management. It attempted to rid courts of cases arising from market fluctuation, while preserving the anti-fraud function of the Securities Exchange Act of 1934. In the first Sixth Circuit case to address the PSLRA, *Comshare,* the court stated:

> the PSLRA did not change the scienter that a plaintiff must prove to prevail in a securities fraud case but instead changed what a plaintiff must plead in his complaint in order to survive a motion to dismiss.

*Comshare,* 183 F.3d at 548–49. "Under the PSLRA, a plaintiff must now 'state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.' " *Helwig,* 251 F.3d 540, 548 (quoting 15 U.S.C. § 78u–4(b)(2)) (emphasis in original).

A fact sensitive analysis of the complaint must be undertaken in light of *Helwig* and *Comshare.* *Helwig,* 251 F.3d at 550. The focus of the analysis is to determine whether the facts as pled produce a strong inference that the defen-

dant acted at least recklessly. *Helwig,* 251 F.3d at 551. " '[R]ecklessness [is] highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.' " *Comshare,* 183 F.3d at 550, (citing *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1025 (6th Cir.1979)). "While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable .... Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences." *Comshare,* 183 F.3d at 550.

Finally, despite the specificity required by the PLSRA, this Court still must "construe the complaint in a light most favorable to the plaintiff, and accept all of [the] factual allegations as true. When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." *Helwig,* 251 F.3d at 553 (quoting *Bloch v. Ribar,* 156 F.3d 673, 677 (6th Cir.1998)). The *Helwig* court stated that its "willingness to draw inferences in favor of the plaintiff remains unchanged by the PSLRA" and further stated that the PLSRA would not be serving to protect investors if it were to become "a choke point for meritorious claims." *Id.*

The standards for the other claims will be addressed in the individual section below.

## IV. ANALYSIS

### A. *Hayes: Four Motions to Dismiss For Failure to State a Claim*

There are only two Counts alleged in the *Hayes* Complaint: (1) a claim against all

---

6. *See also,* Nicole Briski, *Pleading Scienter Under The Private Securities Litigation Reform Act of 1995: Did Congress Eliminate Reckless-* ness, Motive, and Opportunity, 32 Loy. U. Chi. L.J. 155, 164–65 (2000).

defendants under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. 240.10b–5, and (2) a claim under Section 20 of the Exchange Act, 15 U.S.C. § 78t(a), against the Individual Defendants.[7]

### 1. *Section 10(b) Claim Against KPMG and the Hayes Individual Defendants*

To state a claim under § 10(b) of the Exchange Act and Rule 10b–5, a plaintiff must allege, in connection with the purchase or sale of securities: (1) the misstatement or omission of a material fact; (2) made with *scienter;* (3) upon which the plaintiff justifiably relied; and (4) which proximately caused the plaintiff's injury. *In re Comshare, Inc.* 183 F.3d 542, 548 (6th Cir.1999). Defendants concede all of the elements except *scienter.*

When evaluating whether a complaint sufficiently alleges *scienter,* the Court asks whether the facts as pled produce a strong inference that the defendant acted at least recklessly. *Helwig,* 251 F.3d at 551. "'[R]ecklessness [is] highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.'" *Comshare,* 183 F.3d at 550 (citing *Mansbach,* 598 F.2d at 1025).

Further, while not an exhaustive list, the Sixth Circuit has identified a number of factors that are relevant to the *scienter* inquiry, which all the parties discuss in their pleadings:

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Helwig,* 251 F.3d at 552 (cited in *Ford,* 184 F.Supp.2d at 634). The Court stated that "[w]e find this list, while not exhaustive, at least helpful in guiding securities fraud pleading." *Id.*

a. *Individual Defendants' arguments*

Defendant Cucuz contends that the Complaint "fails to allege *any* particularized facts that would give rise to any 'strong inference' of reckless conduct on the part of Cucuz." Further, Cucuz argues that the Complaint fails to satisfy even one of the *Helwig* factors. In addition, while recognizing the size of the re-

---

**7.** Again, the *Hayes* Individual Defendants are Cucuz, Shovers, Vermilya, Christophe, Ro- dewig, and Witt.

statement of the Company's financial picture has been used by courts as factor, Cucuz argues they have only done so when coupled by other "red flags," or warning signs, that were ignored, citing *In re: Telxon Corp. Secs. Litig.*, 133 F.Supp.2d 1010, 1030 (N.D.Ohio 2000) and *In re Credit Acceptance Corp. Sec. Litig.*, 50 F.Supp.2d 662, 678–79 (E.D.Mich.1999) and argues there are no such red flags alleged here.

Defendants Shovers and Vermilya argue that the Complaint does not specifically attribute any of the "materially false and misleading statements" to either of them. Also, they argue that many of the statements they are alleged to have signed simply describe the Company's internal audit procedures without making any representation regarding the Company's financial condition. They assert that the other allegations of wrongdoing lump all of the Defendants together, but they contend that is not allowed under Rule 9(b). Shovers and Vermilya maintain that, at most, the Complaint alleges they signed financial disclosures. While the Complaint mentions Shovers' bonus was related to stock performance, they assert that bare allegations of financial motivation are insufficient, by themselves, to support a strong inference of *scienter*, citing *Ford*, 184 F.Supp.2d at 635.

Defendants Christophe, Rodewig, and Witt ("Audit Committee Defendants") allege that they did not know anything until August 2001, when the Board had the Audit Committee initiate an investigation. They argue that when alerted to the financial "shenanigans," they responsibly hired "the nationally respected law firm Skadden Arps and the Big Four accounting firm Ernst & Young," to complete a speedy restatement. Like the other Defendants, they assert that the Complaint is deficient because it is boilerplate and conclusory. They say that the Complaint's deficiency is best illustrated by the fact that it does not even mention them by name until Rodewig is credited with "spear-heading" the Audit Committee investigation—an action that led to the restatements. For all of the other allegations, they are merely lumped in with the other Defendants. They assert that:

> [T]he Complaint alleges that the "defendants had actual knowledge of the misrepresentations and omissions of material facts" set forth in the Complaint, but alleges no specific conversation, meeting, document or event which gave the Audit Committee actual knowledge of any "misrepresentations and omissions" before August 2001, when they launched the Audit Committee investigation.

Finally, KPMG, asserting many of the same arguments, says that the case should be dismissed against them "because it assumes that claims are necessarily stated against auditors ... whenever financial statements have been restated," which is not the law. KPMG says that the incorrect financial statements were prepared by Hayes alone, and the outside auditor's job is merely to "express a professional opinion as to whether the financial statements were presented fairly in accordance with GAAP [generally accepted accounting principals]." KPMG uses Generally Accepted Auditing Standards ("GAAS") to review financial statements, and they argue that "[b]ecause the auditors cannot look at every document or transaction recorded in Hayes' books, even diligent auditors conducted in accordance with GAAS are subject to the inherent risk that errors in the company's financial statement may not be detected." Specifically, KPMG asserts that the Complaint does little more than describe the difference between the financial statements and the restatements, without asserting facts to support a strong inference that KPMG acted with *scienter*. *Comshare*, 183 F.3d at 553 ("The failure to follow GAAP is, by itself, insufficient to

state a claim for securities fraud."). KPMG conclude that it should be dismissed from the case because the Complaint does not "identify what auditing procedures should have been conducted or why and how different auditing procedures would have discovered the errors identified" or what facts it knew and ignored.

### b. *Plaintiffs' response*

Plaintiffs respond that, first, no Defendant denies that he made false and misleading statements, only that the Complaint fails to allege he did so intentionally or recklessly. Plaintiffs point to the Company's own press releases that admit the earlier statements were materially false and misleading. For example, in announcing the restatements, the Company stated on September 5, 2001, the accounting errors occurred due to "a failure within certain parts of the Company to comply with sound and well-established accounting policies" (*Hayes* Compl. ¶ 9).

Further, the Company stated on February 19, 2002:

> The Company's Board of Directors has always expected and required proper financial reporting. Unfortunately, that view was not properly reflected in the attitudes and actions of certain managers . . . (*Hayes* Compl. ¶ 14).

Plaintiffs also emphasize that Defendant Cucuz was first removed as President and CEO of the Company, and ultimately, he was also removed as Chairman of the Board without explanation.

Second, they argue that the Defendants attempt to parse the Complaint, but it must be looked at as a whole. Plaintiffs then list several allegations in the Com-

plaint they feel are sufficient to state a claim against each of the Defendants.

■ In summary, Plaintiffs point to:

- *Sophisticated Accounting Manipulations*–This is one of the *Helwig* factors, and Plaintiffs assert that there were at least three manipulative business practices designed to hide information from investors. *Helwig*, 251 F.3d at 552 ("disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication"). First, in April 1998, the Company created a "special purpose entity" that was used to remove certain accounts receivable and corresponding reserves for bad debt off its balance sheet. The Complaint alleges that the Defendants knew that the "entity had no legitimate business purpose other than to conceal information from investors and to aid management in carrying out its fraud" (*Hayes* Compl. ¶ 50).

Second, the Company shipped defective aluminum wheels, knowing they were defective and would be returned, in order to recognize the revenue from the sales. Ultimately, the revenues had to be reduced by more than $70 million. The Complaint alleges that management knew about this practice (*Hayes* Compl. ¶ 110). Third, management asked a supplier to increase his quote for tooling costs with the understanding that the supplier would give back the increased costs through a lower unit price. The scheme allowed Hayes to increase their capital costs and reduce the costs of goods sold (*Hayes* Compl. ¶ 111).[8]

---

**8.** Defendant Cucuz protests that Plaintiffs must identify confidential sources by name when making information and belief allegations, such as the ones made here, citing *In re Silicon Graphics, Inc. Secs. Lit.,* 183 F.3d 970, 985 (9th Cir.1999). While Cucuz concedes

that the Second Circuit does not require naming the sources, he argues that the court at least requires that the sources be "described in the complaint with a sufficient particularity to support the probability that a person in the

- *Massive Restatements*-the specifics of the restatements are outlined above in the facts section. The total amount of the restatement was $259 million. The Plaintiffs acknowledge that massive restatements, by themselves, are not sufficient to establish *scienter*. But they argue that this is a factor that can be considered with other factors.

- *Publically Heralded Job Responsibilities*—the Complaint alleges that in the Company's 1999 Annual Report, the Company stated that Management (Defendants Cucuz, Shovers, and Vermilya) were responsible for "maintaining a system of internal accounting controls." Also, the Report stated that KPMG was the independent auditing firm that had full and complete access to ensure that GAAP was followed. The Audit Committee (Defendants Witt, Christophe, and Rodewig) was described as "responsible for assuring that management fulfills its responsibilities in the preparation of the consolidated financial statements." The Report concluded that "the system of internal accounting controls ... provides reasonable assurance that the books and records reflect ... that its established policies and procedures are complied with" (*Hayes* Compl. ¶ 68). Plaintiffs argue that "[d]espite their responsibility for maintaining internal accounting controls, Defendants claim that they did not know that the Company improperly recognized $41.5 million in additional operational expenses, $15.5 million in vendor liabilities, $41.7 million in accrued liabilities relating to acquisitions, $7.3 million in customer pricing adjustments and supplemental pension benefits, $75.4 million in asset impairment losses, $14.4 million in income tax liability, and $36.6 million in deferred tax assets."

- *Compensation Packages*-this is another one of the *Helwig* factors, "the self-interested motivation of defendants in the form of saving their salaries or jobs," 251 F.3d at 552. The Complaint alleges that Defendant Cucuz, CEO, Chairman of the Board of Directors, and Director of Hayes, owned 536,426 shares of the Company's common stock and had options to purchase approximately another 487,334 shares. In addition, Cucuz stood to receive a bonus that would double his annual salary ($700,000 in 1999 and $755,000 in 2000) if the Company met certain targets for annual earnings, return on invested capital, and cash flow (*Hayes* Compl. ¶ 21). Similarly, Defendant Shovers, CFO, Chief Accounting Officer and Vice President of Finance of Hayes, owned 143,888 shares of Hayes common stock and had options to purchase another 122,834 shares. In addition, Shovers stood to receive a bonus equal to 60% of his annual salary ($293,760 in fiscal 2000) if the Company met certain targets for annual earnings, return on invested capital, and cashflow (*Hayes* Compl. ¶ 22).

position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 313–14 (2nd Cir.2000).

Plaintiffs respond that their allegations include "the positions of the sources and their business counterparts, their employment tasks, the location of their work, and the particular fraudulent conduct." They conclude that their allegations contain sufficient particularity to support the probability that one in their positions would possess the information alleged under *Novak*.

The Court agrees with the Plaintiff. First, after carefully combing the page cited by Cucuz in *Silicon Graphics*, the Court cannot find where the Ninth Circuit requires the sources be named. Second, applying *Novak*, Plaintiffs have pleaded sufficient detail to put the Defendants on notice regarding the source of the information.

- *Massive Debt Load*–Plaintiffs assert that the Company had to comply with covenants with its creditors, so Defendants had motive to hide the massive debt it was carrying. There are several specifics in the Complaint regarding the extent of the Company's debt. The Plaintiffs allege that "had the Defendants fairly and accurately disclosed the reasons for all of the debt restructuring, the Company's stock price would have plunged and it would have been unable to obtain any additional financing."
- *GAAP Red Flags*–Plaintiffs point to the things listed above as red flags: the special entity, shipping defective products, and increasing capital costs in exchange for reducing unit costs.

Further, Plaintiffs cite *In re Telxon Sec. Litig.,* 133 F.Supp.2d 1010 (N.D.Ohio 2000), where the court denied defendants' motions to dismiss for failure to plead *scienter*. In *Telxon,* which involved restatements of a lesser magnitude than the ones at issue here, the Court held the following, in combination, was sufficient to survive a motion to dismiss: (1) "extreme restatements of prior financial disclosures" over three years, (2) identifying "blatant violations of GAAP and other basic accounting principles resulting in those misstatements," (3) indicating "factors that should have alerted defendants that the financial data it was releasing to the public was incorrect," (4) outlining "motivations for management to misstate the financial information," and (5) explaining the opportunities presented to defendants "to control the nature and public dissemination of financial data." *Id.* at 1026–27.

### c. Analysis

■ Regarding Defendants Cucuz, Shovers, and Vermilya, they are collectively "Management," and the fraudulent schemes described in the complaint are attributed to them (See, e.g., ¶¶ 45, 46, 49). Defendants Cucuz, Shovers, and Vermilya argue that it is improper to simply lump them together as management. However, this case is unlike many of the complaints found wanting by courts where all defendants were lumped together. Here, the Complaint specifically attributes much of the wrongdoing to only these three Defendants, the CEO (Cucuz), the Chief Financial Officer, Chief Accounting Officer, and Vice–President of Finance (Shovers), and the Corporate Controller and Chief Accounting Officer (Vermilya). As these Management Defendants were responsible for the day-to-day operations at the Company, the Complaint alleges that, at the least, they were reckless not to know the "financial shenanigans" leading to the $259 million dollar restatements. In addition, the Company stated that its Board of Directors had "always expected and required proper financial reporting," but admitted that view was not "properly reflected in the attitudes and actions of certain former managers." This statement is tantamount to an admission that management knew or should have known that proper accounting was not taking place. Therefore, balancing the PLSRA's pleading requirements with the desire not to become "a choke point for meritorious claims," *Helwig,* 251 F.3d at 553, the Court finds that Plaintiffs have plead with as much specificity as possible in the absence of discovery.

Further, Defendants argue that there is nothing alleged except massive restatements. However, while mere allegations of restatements are insufficient by themselves, they can be considered when coupled with the allegations of fraudulent entities to conceal debt, other schemes to inflate profits and discount debt, and the financial motive as to Cucuz and Shovers. *See Telxon,* 133 F.Supp.2d at 1026–27. Therefore, Cucuz, Shovers, and Vermilya's Motions to Dismiss are DENIED.

■ Next, regarding KPMG, Plaintiffs emphasize that KPMG was described in the Annual Report as an independent auditing firm with full and complete access to ensure that GAAP was followed. The Annual Report stated:

KPMG LLP, an independent auditing firm, is engaged to audit the consolidated financial statements of Hayes Lemmerz International, Inc. and its subsidiaries and issue reports thereon. The audit is conducted in accordance with generally accepted auditing standards which includes review of various aspects of the control system and makes test checks of compliance.

. . .

To ensure complete independence, KPMG LLP has full and free access to meet with the Audit Committee, without management representatives present, to discuss the results of the audit, the adequacy of internal accounting controls, and the quality of the financial reporting (*Hayes* Compl. ¶ 68).

Also, Plaintiffs cite the fact that KPMG issued "clean or unqualified opinions" in FY1999 and 2000, which ultimately had to be restated.

However, the rest of the allegations—for example, that management created a special entity to hide bad debt, sent defective wheels and counted the sales, and had a deal with a supplier to fudge sales and capital cost numbers—do not give rise to an inference that KPMG knew or should have found any of those things when conducting its reviews. Plaintiffs have not cited specific deficiencies in the review that KPMG conducted; instead, they merely assert that KPMG should have

found these schemes without explaining why or how that is the case.

Such vague allegations are insufficient to state a claim against KPMG. Instead, "the complaint must identify specific, highly suspicious facts and circumstances available to the auditor at the time of the audit and allege that these facts were ignored either deliberately or recklessly." *In re SmarTalk Teleservices, Inc. Securities Litig.*, 124 F.Supp.2d 505, 515 (S.D.Ohio 2000).

Defendants explain that an audit report is not "a simple statement of verifiable fact," but is rather "a professional opinion based on numerous and complex factors." *Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 11 Cal.Rptr.2d 51, 834 P.2d 745, 763 (1992) (*en banc*). The *Bily* court stated that "[u]sing different initial assumptions and approaches, different sampling techniques, and the wisdom of 20/20 hindsight, few CPA audits would be immune from criticism." *Id.* Defendants assert that Plaintiffs' Complaint alleges fraud without support because it is the product of 20/20 hindsight, which the PSLRA does not allow. *In re Silicon Graphics Securities Litig.*, 183 F.3d 970, 988 (9th Cir.1999) ("Congress enacted the PSLRA to put an end to the practice of pleading 'fraud by hindsight.' ").

■ Thus, even taking the Plaintiffs allegations as true, they have not asserted KPMG acted with *scienter*, but merely that KPMG was negligent, which is insufficient to state a claim for securities fraud against KPMG. Thus, KPMG's Motion to Dismiss is GRANTED. Since KPMG is not implicated in the Section 20 Count, it is hereby DISMISSED WITHOUT PREJUDICE [9] from *Hayes*.

---

9. The Plaintiffs may refile stronger allegations against KPMG, addressing the deficiencies outlined above, if they find evidence that KPMG either knew or should have known, but recklessly disregarded, the Company's true financial condition.

The Defendants argue that Plaintiffs should be denied leave to amend, citing *In re Champion Enterprises, Inc. Securities Litig.*, 145 F.Supp.2d 871, 872 (E.D.Mich.2001) (stating that the PSLRA altered the general rule that leave to amend should be liberally granted

Finally, as for the Audit Committee Defendants, they assert that their job was to hire a reputable accounting firm, and they hired KPMG. It is undisputed that KPMG always filed reports indicating that everything was in order. Since KPMG was their primary source of information, if KPMG did not tell them about the problems, they argue there is no way they would have known. Eventually, when problems were uncovered, the Audit Committee argues that they promptly hired a

and holding that complaints that fail to state a claim should be dismissed with prejudice).

However, the Court declines to follow *Champion*. After *Champion*, the Sixth Circuit held that, "[i]n the securities litigation context, leave to amend is particularly appropriate where the complaint does not allege fraud with particularity." *Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir.2002). The Court finds that *Morse*, in addition to being binding precedent, is much more applicable under these facts than *Champion*.

In *Morse*, the Sixth Circuit found that denial of leave to amend was an abuse of discretion. The *Morse* court explained that the general rule under Federal Rule of Civil Procedure 15 is that leave to amend should be freely granted. *Id.* The *Morse* court then recognized several factors that should be evaluated in considering whether to deny leave to amend:

> Denial may be appropriate ... where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc."

*Id.* at 800 (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

None of the above cited factors for denying leave are implicated here. Plaintiffs have not engaged in dilatory or delaying tactics, nor has there been repeated failure to satisfy the pleading requirements. While there has been one Amended Complaint, it was amended to add the Company's February 2002 announcement that the restatement would be much larger than previously announced and to remove the bankrupt company as a Defendant, not in response to a finding of deficiency by this Court.

As for prejudice, in *Morse*, the Sixth Circuit held no prejudice was present, in part, because under the discovery stay, defendant would not be subject to duplicative discovery. *Id.* at 801. This case is in a slightly different procedural posture, but the general premise is applicable here. This Court has already found that the allegations in the Complaint were pleaded with sufficiently specificity to survive dismissal as to three Defendants. Therefore, discovery is going to take place. If discovery uncovers specific facts implicating KPMG acted with *scienter*, only then will KPMG be brought back into the suit. In *Morse*, the Sixth Circuit stated that:

> We recognize [defendant] will be inconvenienced by another round of motion practice, but given the ... competing interest of the proposed class, such inconvenience does not rise to the level of prejudice that would warrant denial of leave to amend.

*Id.* Similarly, here, KPMG will be inconvenienced if they are brought back into the lawsuit, but that inconvenience is outweighed by the putative class members right to recover under federal securities laws for knowing and/or reckless conduct.

Finally, allowing amendment here is not futile. As emphasized in *Champion*, the goal of the PSLRA was to prevent strike suits and costly discovery. *Champion*, 145 F.Supp.2d at 873. Here, however, after surviving dismissal as to some Defendants, there is no fear that this is merely a baseless strike suit. Instead, because the Plaintiffs have had no discovery, they simply do not have the specifics to determine what KPMG knew and what they should have known. Thus, this case is much different than *Champion* where the court felt after three prior bites at the proverbial apple, the Plaintiffs had not stated a claim and should not be allowed to go on a fishing expedition. *Id.* at 874 (finding that amendment would be futile).

It may be that the Plaintiffs never will discover any deficiencies in KPMG's audits that amounts to *scienter*. In that event, KPMG will never be brought back into this case. However, in balancing the PSLRA's goals of preventing strike suits with the Plaintiffs' right to recover against those who may have violated federal securities law, the Court concludes that dismissal without prejudice is the appropriate course of action.

reputable law firm and accounting firm, which led to the restatements.

The Plaintiffs counter that the Audit Committee's entire function was to ensure the accuracy of the Company's financial statements, and they signed the Company's 10–K forms for FY 1999 and 2000. The Plaintiffs point to language in the Annual Report that stated:

> The Board of Directors, through the Audit Committee (which is comprised entirely of non-employee Directors), is responsible for assuring that management fulfills its responsibilities in the preparation of the consolidated financial statements. The Committee selects the independent auditors annually in advance of the Annual Meeting of Stockholders and submits the selection for ratification at the Meeting. In addition, the Committee reviews the scope of the audits and the accounting principles being applied in financial reporting. The independent auditors, representatives of management, and the internal auditors meet regularly (separately and jointly) with the Committee to review the activities of each to ensure that each is properly discharging its responsibilities (*Hayes* Compl. ¶ 68).

However, while sufficient to allege negligence, the Plaintiffs cannot point to any knowing or reckless actions committed by the Audit Committee Defendants rising to the level of *scienter*. The Complaint does describe false entities, schemes, and fraudulent practices, but those allegations do not include allegations of knowledge or recklessness by any of the Audit Committee Defendants. Therefore, the Audit Committee Defendants Rodewig, Chris-

tophe, and Witt's Motion to Dismiss is GRANTED, and the § 10b claim against them is DISMISSED WITHOUT PREJUDICE.[10]

## 2. *Section 20 Claim Against the Individual Defendants*

 Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

While the Sixth Circuit has not expressly adopted a test for control liability, they cited with approval a test from the Eighth Circuit. Thus, to plead control person liability in this Circuit, at the least, the Plaintiff must demonstrate (1) that the defendant exercised control over the operations of the violator in general and (2) that the defendant possessed the power to control the transaction or activity upon which the primary violation is predicated. *Sanders Confectionery Products, Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 486 (6th Cir.1992) (citing *Metge v. Baehler*, 762 F.2d 621 (8th Cir.1985)). Also, all of the parties agree that a § 20 claim is derivative of a § 10(b) claim.

 The only question before the Court is whether Plaintiffs sufficiently pleaded that the Individual Defendants are controlling persons.[11] Defendant Cucuz

---

**10.** *See* footnote 9, *supra*, regarding the Court's dismissal of KPMG without prejudice. The same reasoning applies to the Audit Committee Defendants.

**11.** Defendants Cucuz, Shovers, and Vermilya also argue that if the § 10b claim is dis-

missed, then the derivative § 20 claim must also be dismissed. Their contention is incorrect for two reasons. First, the Court found that the primary § 10b claims against them should not be dismissed.

seems to concede that he is a control person; as the CEO, he would be hard-pressed to argue otherwise. The rest of the Defendants argue they are not controlling persons under § 20, asserting that the allegations regarding control are very thin. For example, they point to Paragraph 131 of the Complaint, which states:

> defendants named in this Count, by reason of their position of officers, directors ... and by reason of their acts described herein, possess and exercise the power to control the affairs and operations of [the Company], as the term control is used in § 20 of the Exchange Act.

Defendants argue that it is not enough to point to the title of the person to state a claim for control liability, citing *Picard Chemical Inc. v. Perrigo Co.,* 940 F.Supp. 1101, 1134 (W.D.Mich.1996) ("Normally, status or formal position by themselves will not suffice to state a claim of control.") (internal quotation omitted).

However, in a part not cited by Defendants, *Picard* goes on to say:

> where the corporate officers are "charged with the day-to-day operations of a public corporation, it is reasonable to presume that these officers had the power to control or influence the particular transactions giving rise to the securities violation."

*Id.* (quoting *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1441 (9th Cir.1987)).

The Plaintiffs respond that Cucuz, Shovers, and Vermilya, as Hayes' management, and the Audit Committee, as overseers to ensure management fulfilled its responsibilities, had the power to control Hayes' misstatements. In addition, Plaintiffs cite *Telxon,* 133 F.Supp.2d at 1033, which states that a motion to dismiss a § 20 claim should be denied where the defendants themselves made the allegedly false and misleading statements.

The Court concludes that the § 20 claims against all of the *Hayes* Individual Defendants survive the motions to dismiss. First, Defendant Cucuz does not contest that he is a control person. Second, the protestations of Shovers, the Chief Financial Officer, Chief Accounting Officer, and Vice–President of Finance, and Vermilya, the Corporate Controller and Chief Accounting Officer, ring particularly hollow. They were "corporate officers ... 'charged with the day-to-day operations of a public corporation, [thus] it is reasonable to presume that these officers had the power to control or influence the particular transactions giving rise to the securities violation.'" *Picard,* 940 F.Supp. at 1134 (quoting *Wool,* 818 F.2d at 1441).

As for the Audit Committee Defendants, whether one is a control person is a factual question, which the Court declines to decide on a motion to dismiss. *Sanders,* 973 F.2d at 485 ("normally [defendant's] status as a control person [is] a question of fact"); *see also In re MicroStrategy, Inc. Secs. Litig.,* 115 F.Supp.2d 620, 661 (E.D.Va. 2000) (whether someone qualifies as a controlling person may be held liable for the primary violator's wrong.").

Second, if the complaint states a primary violation by the Company, even if the Company is not named in the complaint as a defendant, then a § 20 claim can stand if the individuals were controlling persons. *In re CitiSource, Inc. Sec. Litig.,* 694 F.Supp. 1069, 1077 (S.D.N.Y.1988) ("We ... hold that the liability of the primary violator is simply an element of proof of a section 20(a) claim, and that liability need not be actually visited upon the primary violator before a control-

Here, Plaintiffs have stated a primary § 10b claim against the Company. The Complaint very plainly alleges that the Company's statements were false and misleading and that the Company either knew or was reckless in not knowing the statements were false. The only remaining question, then, is whether Cucuz, Vermilya, and Shovers are controlling persons.

trolling person is a "complex factual issue ... not ordinarily subject to resolution on a motion to dismiss."). Further, *Telxon* holds that a motion to dismiss should be denied where the misstatements were made by the defendants themselves, as is the case here. Finally, the Complaint alleges that the Company publically touted the Audit Committee's important role in the auditing process:

> The Board of Directors, through the Audit Committee (which is comprised entirely of non-employee Directors), is responsible for assuring that management fulfills its responsibilities in the preparation of the consolidated financial statements. The Committee selects the independent auditors annually in advance of the Annual Meeting of Stockholders and submits the selection for ratification at the Meeting. In addition, the Committee reviews the scope of the audits and the accounting principles being applied in financial reporting. The independent auditors, representatives of management, and the internal auditors meet regularly (separately and jointly) with the Committee to review the activities of each to ensure that each is properly discharging its responsibilities (*Hayes* Compl. ¶ 68).

The Company held the Audit Committee members out to the public as persons with significant responsibilities and control over accounting matters.

The various *Hayes* Individual Defendants' Motions to Dismiss the § 20 claims are DENIED.

### B. *Pacholders: Six Motions to Dismiss For Failure to State a Claim*

In addition to the two counts found in the *Hayes* Complaint, violations of § 10(b) and § 20, there are six other counts in the *Pacholders* Complaint. All of the Defendants have filed motions to dismiss. Because many of the issues overlap, the Court has grouped some of the motions and will address the motions to dismiss in the following order:

- Section B.1 will address the § 10b claim against Cucuz, Shovers, Vermilya, Christophe, Witt, and Rodewig (Count IV) and against KPMG (Count V).
- Section B.2 will address the alleged violation of Section 18 of the Exchange Act, 15 U.S.C. § 78r(a), by Cucuz, Shovers, Vermilya, Christophe, Witt, Rodewig, Ying, Grillo, Levy, Lightcap, Kukwa–Lemmerz, and Meilicke (Count VII).
- Section B.3 will address the alleged violation of Section 12(a)(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77*l*(a)(2), by CIBC and CSFB (Count II).
- Section B.4 will address the § 12(a)(2) claim against Cucuz and Shovers (Count I).
- Section B.5 will address the § 20 claim against Cucuz, Shovers, Vermilya, Christophe, Witt, and Rodewig (Count VI) and the alleged violation of Section 15 of the Securities Act, by Cucuz, Shovers, Christophe, Witt, and Rodewig (Count III).
- Section C will address Kukwa–Lemmerz and Meilicke's Motion to Dismiss for Insufficient Service of Process.

1. *Section § 10(b) Claim Against Six Defendants (Cucuz, Shovers, Vermilya, Rodewig, Witt, and Christophe) and KPMG*

Regarding Cucuz, Shovers, and Vermilya, the *Pacholders* Complaint is at least as specific as the *Hayes* Complaint. Again, they are Management and the wrongdoing is principally alleged against them. Thus, for the reasons stated above, their motions to dismiss are DENIED.

Regarding KPMG, the *Pacholders* Complaint adds some to the allegations

that were found to be insufficient in *Hayes, supra.* They point to the following list of financial issues that KPMG was either fully informed about or recklessly ignorant about: (a) failure to record trade payables and claims; (b) improper deferral of operating expenses; (c) overvaluation of inventory; (d) understatement of customer credits; (e) failure to establish sufficient purchase accounting reserves in connection with acquisitions; (f) failure to record impairments of fixed assets and goodwill; and (g) overstatement of deferred tax assets (*Pacholders* Compl. ¶ 225). This list is further explained at ¶ 106 of the *Pacholders* Complaint.

Defendants argue that Plaintiffs have not adequately pled that KPMG's failure to discover the problems were due to recklessness or intentional behavior rather than negligence. For example, there are no allegations of specific information ignored by auditors, such as an analyst letter, which gave alert to artificially inflated accounts receivable and an SEC inquiry regarding the same. *See In re Health Management Secs. Litig.,* 970 F.Supp. 192, 203 (E.D.N.Y.1997) (finding such information sufficient to raise red flags and creating an inference of *scienter* ).

While Plaintiffs have argued that KPMG was reckless not to have found several GAAP errors, the Complaint merely lists specific GAAS standards and concludes that KPMG failed to comply (*Pacholders* Compl. ¶¶ 123–157). For example, ¶¶ 137–139 allege that KPMG failed to supervise its audit adequately in violation of GAAS. But there is nothing that says why or how. Thus, as with the *Hayes* Complaint, Plaintiffs have asserted KPMG's negligence, but they failed to specifically plead facts demonstrating actual knowledge or recklessness. KPMG's motion to dismiss the § 10(b) count is GRANTED, but it is DISMISSED WITHOUT PREJUDICE.[12]

As for the Audit Committee Defendants, Plaintiffs state they do not merely rely on the Audit Committee's job title to state their claims. Rather, they argue that it is a combination of factors—including:

> the Audit Committee Defendants' obligation to ensure the accuracy of the Company's financial statements, the pervasiveness and severity of the Company's accounting manipulations, the magnitude of the fraud, and the Audit Committee Defendant's knowledge of the Company's accounting practices.

However, despite Plaintiffs' best efforts, nothing contained in the above list demonstrates the Audit Committee's failures were anything more than negligence. Therefore, the Audit Committee's Motion to Dismiss the § 10(b) Count is GRANTED, but it is DISMISSED WITHOUT PREJUDICE.[13]

### 2. *Section 18 Claim Against KPMG and the Pacholders Individual Defendants*

■ To state a prima facie case under Section 18 of the Exchange Act,[14] Plaintiffs

---

**12.** *See* footnote 9, *supra,* regarding the Court's dismissal of KPMG without prejudice in *Hayes.* The same reasons dictate dismissing the § 10b claim against KPMG without prejudice in *Pacholders.*

**13.** *See* footnote 9, *supra,* regarding the Court's position dismissal of KPMG without prejudice. The same reasoning applies to the Audit Committee Defendants in *Pacholders.*

**14.** Section 18 states, in relevant part,

> Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder ..., which statement was at the time and in light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such a statement, shall have

must allege: (1) a false and misleading statement made by defendant; (2) that is material; (3) contained in an SEC filing; (4) upon which plaintiffs relied in their purchase of a security. *Magna Inv. Corp. v. John Does One through Two Hundred,* 931 F.2d 38, 39 (11th Cir.1991). Good faith is an affirmative defense, and the burden of proving it is on the Defendants. *Id.*

 Regarding KPMG, Plaintiffs base § 18 liability on KPMG's "unqualified audit opinions" that the Company's FY 1999 and FY 2000 year-end "financial statements 'present[ed] fairly, in all material respects,' Hayes' financial position, results of operations, and cash flows for those fiscal years in accordance with GAAP" (*Pacholders* Compl. ¶ 124). The Plaintiffs emphasize that the Company stated in its press releases announcing the restatements that the KPMG statements should not be relied upon.

KPMG responds that, under 9(b), Plaintiffs must specifically identify why the audit reports were misleading. In particular, KPMG argues that Plaintiffs have failed to assert:

> what tests required under the circumstances were not performed; what evidence was ignored; what was wrong with audit planning; what should have been discovered about the company's internal controls; what was wrong with audit supervision.

> purchased or sold a security at a price which was affected by such statement, for damages cause by such reliance, unless the person sued shall·prove that he acted in good faith and had no knowledge that such statement was false or misleading.
> 15 U.S.C. § 78r(a).

**15.** Again, the *Pacholders* Individual Defendants are Cucuz, Shovers, Vermilya, Ying, ˙Grillo, Levy, Lightcap, Christophe, Kukwa–Lemmerz, Meilicke, Rodewig, and Witt.

KPMG concludes that the § 18 claim should be dismissed because "plaintiffs have simply cited the restated amounts and boilerplate principles of accounting and auditing," without alleging "any facts known to KPMG at the time it issued its reports on the Hayes financial statements that should have sounded warning bells."

The Individual Defendants [15] make similar arguments to KPMG's. All of them argue that the Plaintiffs have not pled with sufficient particularity. Some of them state that Plaintiffs have not demonstrated a lack of good faith or that Plaintiffs relied.

Plaintiffs respond, first, that they have pled reliance (See *Pacholders* Compl. ¶ 249).[16] Second, they argue that good faith is an affirmative defense, and under *Picard,* 940 F.Supp. at 1118, they are not required to negate affirmative defenses in their Complaint. Third, since each of the Defendants signed Form 10–K's, they are responsible for the statements contained therein. The Plaintiffs argue that they have specifically identified the misleading and false, material statements, and there is not any more detail that is necessary to put Defendants on notice about what is being alleged. *See Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1063 (9th Cir. 2000) (explaining that outside directors can be liable for signing a filing containing a misleading statement, due to the lack of a *scienter* requirement).

Because *scienter* is not an element of a § 18 claim, the Plaintiffs prevail. Plain-

**16.** Paragraph 249 states:

> Plaintiffs and the other members of the Class read and relied upon the Company's Form 10–Ks and the financial statements contained therein, not knowing that they were false and misleading. Specifically, Plaintiffs and class members relied on: revenues; net income; sales, general and administrative expenses; depreciation; taxes; amortization; as well as assets including inventory.

tiffs have alleged, for all Defendants, that there were (1) false or misleading statements; (2) that were material; (3) contained in SEC filings; and (4) that Plaintiffs relied upon them. Therefore, all of the Defendants' Motions to Dismiss the § 18 count are DENIED.

### 3. *Section 12 Claim Against CIBC and CSFB*

■ Plaintiffs have sued the Underwriter Defendants asserting they distributed an Offering Memorandum containing financial misstatements. Under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), any person who " 'offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact' may be liable to an unknowing purchaser." *Wright v. National Warranty Co.*, 953 F.2d 256, 262 (6th Cir.1992) (quoting 15 U.S.C. § 77l(a)(2)). Since the Offering Memorandum included the restated financial statements, Defendants do not dispute that there were false or misleading statements contained in it. Instead, the Underwriter Defendants challenge whether it was a "public" offering.

In *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 584, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), the Supreme Court held that "the word 'prospectus' is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder." The Defendants assert that the bond offering was not a public offering, but rather a private placement, pursuant to SEC Rule 144A, 17 C.F.R. § 230.144A (1995). Rule 144A creates a safe harbor from the registration requirements of the Securities Act for certain institutional investors known as Qualified Institutional Buyers ("QIB's")—institutions that own and invest on a discretionary basis at least $100 million. The SEC instituted the rule because, while the Secu-

rities Act was "remedial legislation designed to protect ... unsophisticated, individual investors ..., certain institutions can fend for themselves and ... therefore, offers and sales to such institutions do not involve a public offering" Fed. Sec. L. Rep. (CCH) ¶ 84,335 at 89,534–35, 39 (Oct. 25, 1988). Defendants point to the Offering Memorandum itself, which explicitly states that is being offered under Rule 144A, it is not a public offering, and it is not subject to registration requirements. Defendants then recite several more of the disclaimers included in the Memorandum.

In sum, the Defendants assert that the Section 12 claim against them must be dismissed because: (a) Section 12(a)(2) liability only attaches to persons who offer or sell securities "by means of a prospectus," (b) the Supreme Court held in *Gustafson* that "the word 'prospectus' is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder," and (c) the securities at issue were not offered by means of a prospectus because they were part of a private bond offering made pursuant to SEC Rule 144A.

Plaintiffs respond that the Offering Memorandum was actually a Section 10 prospectus; while not registered, it met each and every SEC requirement for such a document. To demonstrate, Plaintiffs list all of the information required by a registered Section 10 prospectus, compare it to the information in the Offering Memorandum, and conclude it conforms to those requirements in all relevant respects.

Defendants respond that they should not be punished for putting information into a Memorandum even though they were not required to do so.

Plaintiffs also argue that Defendants' intent was to offer the bonds to the public. Plaintiffs point to language in the Offering Memorandum, stating that the Company

was going to file a registration statement with the SEC within sixty days of the Senior Bond issuance, creating a registered offer to exchange the unregistered bonds for registered bonds, with substantially similar terms. Plaintiffs assert that the two transactions should be considered an integrated whole, with the unregistered part leading to the registered part. Plaintiffs contend it was only the Company's bankruptcy that halted the promised exchange for registered bonds.

Defendants, on the other hand, emphasize that the Offering Memorandum explicitly warns that "there can be no assurance that such registration statement will be filed or, if filed that it will become effective."

Next, Plaintiffs argue that the Offering Memorandum was, in fact, widely disseminated to the public, soliciting hundreds if not thousands of purchasers, which is typical of a public offering. They emphasize that the many cases cited by Defendants, where courts have considered it a private offering, they were very small offerings, for example, twelve people or less.

Plaintiffs then argue that *AAL High Yield v. Ruttenberg*, civil action 00–1404, slip op. at 12 (N.D.Ala. Oct. 1, 2001) (unpublished), while not binding, is factually analogous to this case and, therefore, instructive and persuasive. In *AAL High Yield*, the court stated:

> Whether the transaction in question was not registered because it is claimed exempt under ... Rule 144A is not dispositive. "Liability imposed by § 12(a)(2) has noting to do with the fact of registration," but rather with "whether a prospectus is a document soliciting the public to purchase securities from the insurer."

*Id.* at 12 (quoting *Gustafson*, 513 U.S. at 579, 115 S.Ct. 1061). Thus, Plaintiffs argue that whether there was registration does not dictate whether there is § 12 liability.

Also, the *AAL High Yield* court declined to dismiss the § 12 claims against some defendants in the absence of more factual information. *Id.* at 15 (stating that "[t]he line between public offerings and private placements is neither well-defined nor easily decipherable."); *see also Fisk v. Super-Annuities*, 927 F.Supp. 718, 731 (S.D.N.Y. 1996) (denying motion to dismiss because the court could not conclude that "plaintiff cannot prevail on the Section 12(2) claim under any facts that might be proved within the confines of the existing pleadings"). Plaintiffs conclude that whether this is a public or private offering is a fact intensive inquiry, inappropriate for resolution on a motion to dismiss.

Defendants reply that whether or not there were a large number of people solicited is irrelevant. They argue that this case is distinguishable from the handful of cases cited by Plaintiffs where the Court denied motions to dismiss after plaintiffs alleged facts demonstrating that a large number of people were solicited. In those cases, exemption from registration could be violated by a showing of mass solicitation. Here, Defendants argue, the exemption is effective even if the number of qualified institutions reached into the hundreds or thousands. Also, *Fisk* is distinguishable because the court held that plaintiffs' allegations survived the motion to dismiss because, if proven, the claimed exemption did not apply. Thus, the factual dispute that was inappropriate for resolution in *Fisk* was whether there was a *bona fide* private offering. Here, there is no suggestion that this was not a *bona fide* private offering; there is no allegation that the bonds were offered to anyone but QIBs, as required by Rule 144A to be considered a private offering.

Finally, after oral argument in this matter, Defendants sent the Court a letter, dated March 3, 2003, drawing its attention to *In re Safety–Kleen Corporation Bondholders Litigation,* C/A No. 3:00–1145–17 (D.S.C. Mar. 27, 2002) [hereinafter *"Safety Kleen* Order"].[17] Plaintiffs asked for and were given an opportunity to respond to Defendants late submission, and they submitted a supplemental brief dated March 17, 2003.

In *Safety Kleen,* the court, applying *Gustafson,* dismissed the § 12(a)(2) claim because the bonds were only offered to QIBs. Under Rule 144A, offerings to QIBs "shall not be deemed to have been offered to the public." *Safety Kleen* Order at 3. Before deciding the issue, though, the district court solicited the views of the SEC, asking "[c]an there be Section 11 or Section 12(a)(2) liability for the contents of a Rule 144A offering to QIBs when that placement is followed by a registered exchange offer?" (D's Exh. 2, letter to SEC General Counsel David M. Becker from Judge Joseph Anderson, dated June 20, 2001).

The SEC replied that the "more likely reading" of *Gustafson* is that there is no " § 12(a)(2) liability for the alleged misstatements in the Rule 144A offering memorandum." (D's Exh. 3, Letter to Judge Anderson from SEC General Counsel Becker, dated August 9, 2001 at 3 [hereinafter "SEC letter"] ). However, the SEC cautioned that it was sympathetic to the plaintiffs' argument on policy grounds. (*Id.*). The SEC stated that, prior to *Gustafson,* the "Commission had understood Section 12(a)(2) as applying to all offers and and sales of securities, whether in a public or private transactions." (*Id.*).

Plaintiffs urge that "[i]t is clear from the SEC letter that the SEC believes—as Plaintiffs do—that the term prospectus as used in Section 12(a)(2) should be construed to include Rule 144A offering memoranda." Plaintiffs argue that the *Safety Kleen* court misconstrued the SEC's response, putting misplaced deference on the SEC's prediction about what the Supreme Court would do and failing to grant warranted deference to the SEC's interpretation of Section 12(a)(2). They assert that this Court should reject the SEC's ultimate conclusion regarding what the Supreme Court would likely do because it is *not entitled to deference and adopt the* SEC's interpretation of § 12(a)(2) instead.

On a clean slate, this Court would find Plaintiffs have stated a § 12(a)(2) claim. However, in light of *Gustafson,* the Court is bound to find that the Offering Memorandum was a private offering. Applying *Gustafson,* the *AAL High Yield* court found that § 12(a)(2) "demands an inquiry into factors such as the marketing strategies employed, the scope of the Offering, and the 'sophistication' of the offerees." slip. op. at 16. However, the court also found that "Plaintiffs and Defendants have introduced contravening evidence relevant to this inquiry." *Id.* Here, the Plaintiffs have failed to allege that the bonds were offered to anyone other than QIBs. In fact, the Complaint concedes that the Offering Memorandum was "widely distributed to qualified institutional buyers" (*Pacholders* Compl. ¶ 176). Thus, unlike the plaintiffs in *AAL High Yield* or *Fisk,* Plaintiffs have failed to demonstrate a factual question regarding whether the Offering Memorandum was a *bona fide* private offering.

This conclusion is further bolstered by the letter from the SEC in *Safety Kleen.* Plaintiffs argue that the Court should defer to the SEC's view of § 12(a)(2) liability but not to the agency's view of what the

---

**17.** Defendants acknowledged that the decision was nearly a year old, but they stated that it was an unreported decision, and they only recently became aware of it.

Supreme Court would probably rule. However, it is difficult to discount that the SEC itself believes its interpretation has been trumped by *Gustafson*. In addition, the SEC stated that it submitted an *amicus curiae* brief in *Gustafson* urging its position, which was rejected by the Supreme Court. Therefore, this Court agrees with the *Safety Kleen* court; since Rule 144A expressly provides that offerings to QIBs are private, and *Gustafson* limits § 12(a)(2) liability to public offerings, there can be no § 12(a)(2) liability. The Underwriter Defendants' Motion to Dismiss the § 12(a)(2) claim is GRANTED.

#### 4. Section 12 Claim Against Cucuz and Shovers

Cucuz and Shovers also argue that the Offering Memorandum was not a public offering.[18] Since there are no grounds to meaningfully distinguish Cucuz and Shovers from the Underwriter Defendants, Cucuz's and Shovers' Motions to Dismiss the § 12(a)(2) claims are GRANTED for the reasons stated above.

#### 5. Section § 20 Claim Against Cucuz, Shovers, Vermilya, Christophe, Witt, and Rosewig, and Section § 15 as to all of the above minus Vermilya

Like the *Hayes* Plaintiffs, the *Pacholders* Plaintiffs claim Defendants violated § 20 of the Exchange Act. In the *Hayes* section, *supra*, the Court stated the standard for § 20 liability and quoted the stat-

ute. However, they have also added a claim under § 15 of the Securities Act.[19] The standard for control liability for § 15 is the same as § 20. *Laven v. Flanagan*, 695 F.Supp. 800, 806 (D.N.J.1988). As noted above, § 20 claims are derivatives of § 10(b) claims; similarly, § 15 claims are derivatives of § 12 claims.

Taking § 20 first, Defendants contest liability on two bases. First, they argue that there can be no liability against control persons without a primary § 12 or § 10(b) violation. However, like the Plaintiffs in *Hayes*, the *Pacholders* Plaintiffs have stated a primary violation by the Company, and it is not necessary for the Company to be a named defendant for § 20 liability to attach.[20] Since this is the only argument asserted by Cucuz, Shovers, and Vermilya, their Motions to Dismiss the § 20 claim are DENIED.

Second, while Cucuz, Shovers, and Vermilya do not contest that they are "controlling persons," the Audit Committee members argue that they are not. First, Plaintiffs argue that this a fact inquiry that is not usually made on a motion to dismiss, citing *In re MicroStrategy, Inc. Secs. Litig.*, 115 F.Supp.2d 620, 661 (E.D.Va.2000) (whether someone qualifies as a controlling person is a "complex factual issue ... not ordinarily subject to resolution on a motion to dismiss."). Second, Plaintiffs state that their allegations of control are not based on the title the Audit

---

**18.** Cucuz makes the additional argument that he was not a seller of securities, which is irrelevant because the Court disposed of his motion on other grounds.

**19.** Section 15 of the Securities Act reads:
Every person who, by or through stock ownership, agency, or otherwise ... controls any person liable under [Sections 11 or 12 of the Securities Act], shall also be liable jointly and severally with and to the same extent as such controlled person ...

unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.
15 U.S.C. § 77*o*.

**20.** *See supra*, footnote 11. The same principle applies to § 15 claims. *See Elliott Graphics, Inc. v. Stein*, 660 F.Supp. 378, 381 (N.D.Ill. 1987) (bankrupt "controlled person" need not be joined to assert Section 15 claim).

Committee members had, as the Defendants allege. Instead, it is based on the fact that they signed "at least one of the Company's SEC filings containing false or misleading statements," which coupled with allegations of control or influence in the Company, is "sufficient to allege their status as control persons," citing *Ballan v. Upjohn Co.,* 814 F.Supp. 1375, 1388 (W.D.Mich.1992). The Plaintiffs then point to all of the allegations in the Complaint demonstrating the control Audit Committee Defendants had over the Company. For example, the Complaint alleges that:

> The Audit Committee was intimately involved with and controlled the Company's accounting and its financial reporting, and knew facts or had access to information suggesting that the Company's financial statements, and public statements, were false (*Pacholders* Compl. ¶ 110).

Similarly, the Complaint cites all of the duties of the Audit Committee found in the Company's Charter (*Pacholders* Compl. ¶ 108). Finally, the Complaint asserts that:

> [T]he Company's annual financial statements for fiscal 1999 and 2000 state the Audit Committee "is responsible for assuring that management fulfills its responsibilities in the preparation of the consolidated financial statements," that it "reviews the scope of the audits and the accounting principles being applied in financial reporting," and that it meets regularly with the independent auditors, representatives of management, and the internal auditors "to review the activities of each to ensure that each is properly

discharging its responsibilities" (*Pacholders* Compl. ¶ 109).

For the reasons asserted by Plaintiffs and for the reasons stated above in *Hayes,* the Court finds that the Plaintiffs have adequately alleged that the Audit Committee Defendants were control persons. The Audit Committee Defendants' Motion to Dismiss the § 20 claim are DENIED.

■ Regarding the § 15 claims, since the Court found no primary liability under § 12(a)(2), as a derivative claim, there can be no § 15 liability either.[21] Therefore, Cucuz's and Shovers' Motions to Dismiss the § 15 claim are GRANTED.

### C. *Motion to Dismiss for Insufficiency of Service of Process by Defendants Kukwa–Lemmerz and Meilicke*

■ Kukwa–Lemmerz and Meilicke ("German Defendants") are German residents and were directors of the Company during the relevant time periods. Like the other outside directors, they are only accused of violating § 18.

The German Defendants contend service of process was insufficient on two grounds: (1) the law allowing the resident agent of the Company in Delaware to accept service on behalf of directors of companies does not apply to securities fraud actions, and (2) the service did not follow the requirements for international service established by the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638 ("Hague Convention").

---

**21.** At first blush, this result is inconsistent with the survival of the § 20 claim against the Audit Committee Defendants, but the discrepancy is easily explained. Even though Plaintiffs failed to state a claim of primary liability against the Audit Committee, Plaintiffs stated a § 10(b) primary violation by the Company, which was, in turn, sufficient to state a derivative § 20 claim. However, under § 15, Plaintiffs cannot state a primary violation by the individuals or the Company.

The Court need only reach the first question because Plaintiffs basically concede they did not follow the Hague Convention. Instead, Plaintiffs argue they did not have to follow the Hague Convention because service was validly effectuated on a domestic agent, under *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 707, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988) ("[w]here service on a domestic agent is valid and complete ... our inquiry ends and the [Hague] Convention has no further implications."). Thus, the first question, whether Plaintiffs validly served the domestic agent under Federal Rule of Civil Procedure 4(e),[22] is the critical inquiry.

The Plaintiffs assert that service was proper because they served the Company's resident agent located in Delaware. Under 10 Del. C. § 3114(a), directors of Delaware corporations have agreed to accept service through the corporation's resident agent. The provision reads, in part:

> Every nonresident of this state who ... accepts election or appointment as a director ... of the governing body of a corporation organized under the laws of this State ...shall ... be deemed thereby to have consented to the appointment of the registered agent of such corporation ... as an agent upon whom service of process may be made in all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which such director ... is a necessary or proper party, or in any action or proceeding against such director ... for violation of a duty in such capacity ...

10 Del. C. § 3114(a). Then, the Plaintiffs turn to the Exchange Act, which provides for nationwide service of process in federal securities cases, "wherever the defendant may be found." 15 U.S.C. § 78aa. Where a defendant has appointed a registered agent to accept service of process, the defendant "may be found" where the agent is found. Moreover, the Supreme Court has held that service upon an authorized agent comports with due process where, as here, the defendant receives actual notice of the lawsuit. *See National Equip. Rental, Ltd. v. Szukhent,* 375 U.S. 311, 315, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964).

Defendants respond that the Hague Convention "shall apply in all cases ... where there is occasion to transmit a judicial or extrajudicial document for service abroad." 20 U.S.T. 361, Art. 1. *See also Societe Nationale Industrielle Aerospatiale v. United States District Court,* 482 U.S. 522, 534, n. 15, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987) (identifying the language in the Hague Convention treaty as mandatory). Therefore, since § 3114 requires mailing the pleadings to the Defendants' residences, Defendants contend that § 3114's mailing requirement triggers the Hague Convention. Also, Federal Rule of Civil Procedure 4(e)(1) requires that the complaint and summons be mailed to Defendants' residence, which again triggers the Hague Convention.

Plaintiffs counter that they served Defendants under Rule 4(e)(2) rather than Rule 4(e)(1), which does not require a mailing to the Defendants' residences. According to Plaintiffs, Rule 4(e)(2) does not require that the service be effectuated un-

---

**22.** Federal Rule of Civil Procedure 4(e) reads:
Unless otherwise provided by federal law, service ... may be effectuated in any judicial district of the United States:
(1) pursuant to the law of the state in which the district court is located, or in which service is effected, for the service of

a summons upon the defendant in an action brought in the courts of general jurisdiction; or
(2) ... by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process.

der state law, only that service be effectuated on the registered agent.

Defendants reply that if Plaintiffs are serving Defendants under Rule 4(e)(1), there is no enabling statute that allows them to use Delaware law, because Rule 4(e)(2) does not incorporate state law. Thus, Defendants argue § 3114 does not apply, leaving Plaintiffs without a resident agent to serve.[23]

The Court concludes that Plaintiffs' attempt to use a little of § 3114, Rule 4(e)(2), and 15 U.S.C. § 78aa, while trying to avoid the unfavorable parts, is unavailing. Plaintiffs have not cited any support for their ability to cobble together the favorable portions of these three statutes, and this Court cannot find any. First, Rule 4(e)(2) does not appear to incorporate state law, leaving Plaintiff with Rule 4(e)(1). Under Rule 4(e)(1), a mailing to Defendants' residence is required, which triggers the Hague Convention. Even if Rule 4(e)(2) is considered to incorporate state law, a mailing is also required by § 3114. Plaintiff cannot use § 3114 for the agent, but ignore the rest. In addition, while Plaintiffs could use the Michigan Long–Arm Statute, *see* Rule 4(e)(1) (service "may be effected ... pursuant to the law of the state in which the district court is located"), Michigan law also requires a mailing to Defendants' residence. M.C.L. § 6000.1913(1)(a). Finally, the Court is sympathetic to Plaintiffs' argument that the German Defendants have actual notice of the lawsuit against them and that following the Hague Convention is a lengthy, time-consuming process, but beyond this rhetoric, Plaintiffs have not provided any support for their interpretation.

That said, Plaintiffs are further along than they might think. First, at oral argument, the German Defendants conceded that this Court has personal jurisdiction over them. Second, the Defendants did not raise any other 12(b) objections in their initial pleadings before this Court. Thus, they may have waived a subsequent 12(b)(6) motion or any other 12(b) motion they might otherwise have been able to claim. *See* Fed.R.Civ.P. 12(h) (describing limited circumstances for bringing Rule 12 motions when they are not included in the first Rule 12 motion filed).

---

**23.** Defendants also contend that § 3114 does not apply because it does not cover securities fraud cases, but only cases regarding fiduciary duties. In support, Defendants cite cases, such as *Mt. Hawley Insurance Co. v. Jenny Craig*, 668 A.2d 763, 768 (Del.Super.1995) ("It is established precedent that jurisdiction under § 3114 over a non-resident director can only be accomplished when the dispute involves the rights, duties, and obligations which directors owe to their service to the corporation, that is, actions against directors involving breaches of fiduciary duties they owe to their corporations.") and *Kelly v. McKesson HBOC, Inc.*, 2002 WL 88939 (Del.Super., Jan.17, 2002) ("Delaware courts have consistently held that ... § 3114 does not confer personal jurisdiction over non-resident directors for alleged violations of the Securities Act.") (unpublished).

Plaintiffs counter that Defendants' cited cases are inapposite because they do not address service of process, but rather whether the Delaware state courts could exercise personal jurisdiction over the international directors, which is not at issue here. In support, Plaintiffs cite *Hana Ranch, Inc. v. Lent*, 424 A.2d 28, 30 (Del.Ch.1980) and *In re Cambridge Fin. Group*, 1987 WL 19677 at *2 (Del. Ch. Nov.9, 1987).

Defendants respond that Plaintiffs cases actually support Defendants' argument because both courts dismissed the case against the non-resident directors after finding that § 3114 did not apply to cases involving claims other than breaches of fiduciary duties.

The Court declines to resolve this dispute because even if § 3114 can apply to cases other than breaches of fiduciary duties, the Court concludes, *supra*, that § 3114 requires a mailing to Defendants' residences abroad, which, in turn, triggers the Hague Convention.

Finally, despite Defendants' request for dismissal, the Court intends to quash the service of process and retain the case while Plaintiffs comply with the Hague Convention. Defendants cite two unpublished, district court cases from other jurisdictions arguing that courts have recently dismissed cases where the Hague Convention was not followed. *See Casio Computer Co., Ltd. v. Sayo,* 2000 WL 1877516 at 28 (S.D.N.Y. Oct.13, 2000) (unpublished) and *Gilmore v. Festo KG,* 1998 WL 164887 (N.D.Ill. Mar.31, 1998) (unpublished). Plaintiffs, though, cite published, binding Sixth Circuit precedent, which states "if the first service of process is ineffective, a motion to dismiss should not be granted, but the case should be retained for proper service later." *Stern v. Beer,* 200 F.2d 794, 795 (6th Cir.1953). *See also Vorhees v. Fischer & Krecke,* 697 F.2d 574, 576 (4th Cir.1983) ("[T]he action should not have been dismissed until the plaintiffs were given a reasonable opportunity to attempt to effect valid service" under the Hague Convention); 5A Charles Alan Wright & Arthur R. Miller, Federal Practice And Procedure § 1354 (2d ed. 1990 & Supp.2003) (courts generally quash ineffective service and preserve the action when there is "a reasonable prospect that plaintiff ultimately will be able to serve defendant properly.").

Plaintiffs have the better argument on the case law. In addition, there is little reason not to retain the case as a practical matter. Even if the case were dismissed, it would be a dismissal without prejudice. 5A Wright & Miller at § 1354 ("dismissal would be without prejudice and probably would lead to the reinstitution of the suit by plaintiff"). Consequently, from an efficiency standpoint, quashing service is much simpler than requiring Plaintiffs to refile, and "dismissal needlessly burdens him with additional expense and delay and postpones the adjudication of the controversy's merits." *Id.* Defendants' Motion to Dismiss Due to Insufficiency of Process is GRANTED IN PART and DENIED IN PART. The prior service of process is QUASHED, and the case against the German Defendants is STAYED until service can be effectuated under the Hague Convention.

## V. CONCLUSION

For the reasons stated above, the Court finds the following:

### *Hayes*

1) Cucuz's Motion to Dismiss [31–1] is DENIED on both counts;

2) Shovers and Vermilya's Motion to Dismiss [26–1] is DENIED on both counts;

3) Rodewig, Witt, Christophe's Motion to Dismiss [24–1] is DENIED IN PART on the § 20 claim, and GRANTED IN PART on the § 10b claim. The § 10b claim is DISMISSED WITHOUT PREJUDICE;

4) KPMG's Motion to Dismiss [29–1] is GRANTED, and the § 10b claim is DISMISSED WITHOUT PREJUDICE;

### *Pacholders*

1) Cucuz's Motion to Dismiss [49–1] is DENIED IN PART on § 10, § 20, § 18, and GRANTED IN PART on § 12 and § 15;

2) Shovers and Vermilya's Motion to Dismiss [19–1] is DENIED IN PART on § 10, § 20, § 18, but GRANTED IN PART on § 12 and § 15;

3) Ying, Grillo, Levy, Lightcap, Christophe, Rodewig, and Witt's Motion to Dismiss [20–1] is DENIED IN PART on § 18, GRANTED IN PART on § 10b, and the § 10b claim is DISMISSED WITHOUT PREJUDICE;

4) KPMG's Motion to Dismiss [14–1] is DENIED IN PART on § 18,

GRANTED IN PART on § 10b, and the § 10b claim is DISMISSED WITHOUT PREJUDICE;

5) CIBC and CFSB's Motion to Dismiss [34–1] is GRANTED;

6) Kukwa–Lemmerz and Meilicke's Motion to Dismiss for Insufficiency of Process [46–1] is GRANTED IN PART. The Court QUASHES the insufficient service and STAYS the case against Kukwa–Lemmerz and Meilicke until service can be effectuated under the Hague Convention.